**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Roland Felix EYOUM, Defendant–
Appellant.**

No. 95–2781.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 8, 1996.

Decided June 5, 1996.

Barry Rand Elden, Chief of Appeals, Juanita S. Temple (argued), Office of the U.S. Atty., Criminal Appellate Division, Chicago, IL, for U.S.

Mary M. Rowland, Andrea E. Gambino (argued), Office of the Federal Defender Program, Chicago, IL, for Roland F. Eyoum.

Before ESCHBACH, FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Roland Eyoum pled guilty to knowing receipt, concealment, and sale of illegally imported merchandise, specifically pancake tortoises, in violation of 18 U.S.C. § 545. He challenges the enhancement of his sentence under the Sentencing Guidelines (U.S.S.G.) § 2Q2.1(b)(3)(A) for the value of the tortoises and the additional enhancement under U.S.S.G. § 2Q2.1(b)(2) for the creation of a significant risk of infestation or disease. We affirm the district court's calculation of his sentence.

## I.

Eyoum was involved in the illegal importation of pancake tortoises from Tanzania. Specifically, Eyoum pled guilty to illegally importing 131 pancake tortoises in December of 1994. At the time of the offense, it was unlawful to import pancake tortoises into the United States without a valid export certificate from the country of origin. Since 1992, however, Tanzania has banned the exportation of these tortoises and will not issue export papers. Thus Eyoum's tortoises were imported illegally.[1]

The tortoises were sent to Eyoum from his brother in Tanzania and were to be picked up at O'Hare International Airport. They were sent over in secret compartments in four crates. Import documents stated that these crates only contained other exotic animals,

---

1. Since February of 1995 the importation of pancake tortoises into the United States has been totally banned, due to their endangered status.

specifically ten springhares and two genets.[2] When the crates arrived at O'Hare on December 9, 1994, they were transferred to a "wildlife rehabilitator" because protruding nails inside the crates had injured some of the springhares and genets, and they were bleeding. On December 14, three of the four crates were returned to O'Hare (one remained with the rehabilitator), where Eyoum took custody of them and one day later shipped them to an organization called "The Reptile Service," in Deerfield Beach, Florida. On December 22, agents of the United States Fish and Wildlife Service (USFWS) discovered the illegally imported tortoises at The Reptile Service and were told by Rian Gittman, a reptile wholesaler and the principal officer of the business, that the tortoises had all come from Eyoum. Some of these tortoises were less than four inches in carapace (shell) length, the commercial importation of which has been prohibited since 1975 for public health reasons. 42 C.F.R. § 71.52. In total, the USFWS agents discovered 81 tortoises at The Reptile Service that had been originally imported by Eyoum. A letter from The Reptile Service to Eyoum, subsequently recovered by Florida USFWS agents, revealed that Eyoum and the store had agreed to a price of $50 each for the tortoises.

On January 13, 1995, the Florida agents notified the Wildlife Inspector of Chicago that Eyoum had smuggled pancake tortoises into the United States via false compartments in the crates received at O'Hare in December. By January 14, 1995, when the inspector examined the fourth crate at the home of the wildlife rehabilitator, the 51 pancake tortoises secreted therein were all dead. Of these tortoises, 27 had a carapace length of less than four inches.

On April 14, 1995, Eyoum pled guilty to the second count of a two-count indictment against him. He pled guilty to knowingly receiving, selling, and facilitating the transportation, concealment, and sale of imported pancake tortoises, knowing that they had been imported unlawfully, in violation of 18 U.S.C. § 545.[3] At his sentencing Eyoum received an enhancement under U.S.S.G. § 2Q2.1(b)(3)(A), based on the market value of the illegally imported tortoises. The district court found that the fair-market retail price of the tortoises was $298 each, resulting in a total market value of $39,038 for the 131 tortoises and a four-level enhancement.[4] Eyoum also received a two-level enhancement under U.S.S.G. § 2Q2.1(b)(2) for committing an offense that created a significant risk of infestation or disease. Eyoum was sentenced to twelve months and one day imprisonment, with three years of supervised release. He challenges both enhancements.

## II.

Eyoum's challenge to the four-level market value enhancement under § 2Q2.1(b)(3)(A) has two parts. First, he argues that the market value enhancement should have been calculated using the $50 amount for which he agreed to sell the tortoises. This price would have resulted in a market value of $6550 for the tortoises and an enhancement of only two levels, rather than four. Second, Eyoum argues that, even accepting the government's approach to calculating market value, the $298 price used by the district court was inflated because it was arrived at by averag-

---

2. A springhare is a large, rabbit-like but short-eared animal that resembles a large gerbil. A genet is a small carnivorous animal related to the civet cat and is characterized by a long body and short legs. Both animals are indigenous to Africa.

3. The relevant language of 18 U.S.C. § 545 states as follows:

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law ... [s]hall be fined under this title or imprisoned not more than five years, or both.

4. Under U.S.S.G. § 2Q2.1(b)(3)(A), the sentencing court is directed to increase the base offense level according to the table in U.S.S.G. § 2F1.1 "if the market value of the fish, wildlife, or plants [involved in the offense] exceeded $2000." According to the § 2F1.1 table, the enhancement is one level for amounts from $2000–$5000, two levels for amounts from $5000–$10,000, three levels for amounts from $10,000–$20,000, four levels for amounts from $20,000–$40,000, etc.

ing price lists that included prices for tortoises that were worth more than the tortoises he imported.

■ Because the meaning of "market value" within § 2Q2.1 (b)(3)(A) involves a legal determination of the meaning of Guidelines language, we review the district court's interpretation of this term de novo. *United States v. Hayes,* 5 F.3d 292, 294 (7th Cir. 1993); *United States v. Cojab,* 978 F.2d 341, 343 (7th Cir.1992). The district court rejected the $50 price negotiated by Eyoum and instead determined the "market value" of the illegally imported tortoises by averaging the prices of Florida reptile dealers (and one Texas dealer). Eyoum argues that since he only received $50 apiece for the tortoises, it is unfair to sentence him according to a price of $298 apiece. He maintains that the most appropriate way of calculating the "market value" of the tortoises under § 2Q2.1(b)(3)(A) is to look to the price agreed upon by a willing seller (himself) and a willing buyer (The Reptile Service).

■ This argument has logical force and initially seems plausible. Unfortunately for Eyoum, it runs squarely against the meaning of "market value" under § 2Q2.1(b)(3)(A). Application Note 4 to this section states as follows: "When information is reasonably available, 'market value' under subsection (b)(3)(A) shall be based on the *fair-market retail price.* Where the fair-market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information, such as the reasonable replacement or restitution costs...." U.S.S.G. § 2Q2.1 App. Note 4 (emphasis added). Eyoum offers no argument that this commentary violates the Constitution or a federal statute, or that it is an inconsistent or plainly erroneous reading of the Guidelines language; and we do not find that the commentary suffers from any of these defects. Consequently, the language of Application Note 4 is authoritative and constitutes a binding interpretation of the meaning of "market value" within § 2Q2.1(b)(3)(A). *Stinson v.*

*United States,* 508 U.S. 36, 37–39, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993); *United States v. Krzeminski,* 81 F.3d 681, 684 (7th Cir.1996).

Eyoum does not argue that the $50 price he negotiated with The Reptile Service represents the fair-market *retail* price for pancake tortoises at the time. He essentially admits that this was a "smuggler's price," which one would expect to be less than both the wholesale and the retail prices for the same goods.[5] Thus the application note precluded the district court from calculating the market value of the tortoises as the $50 smuggler's price, rather than the fair-market retail price. Eyoum relies heavily on *United States v. Brookins,* 52 F.3d 615 (7th Cir. 1995), where we affirmed the use of a "thieves' market" price in the calculation of the market value of stolen goods under 18 U.S.C. § 659. In that case the statute required that the stolen goods be worth more than $100, and the evidence revealed that persons involved in the theft of the video camera had stated to would-be purchasers that it's value was between $350 and $600. Brookins himself had said that he could get at least $400 for the video camera. We found that these statements by the thieves were enough to establish that the value of the stolen video camera was greater than $100. A precise determination of the market value of the stolen goods was not necessary in that case, so there was no comparison of this "thieve's price" with a retail price—which could not be precisely determined because the video camera was never recovered. The use of the thieve's price in *Brookins,* which the defendants in that case opposed, does not imply that the district court would have been required to use that price if the retail price had been available and an exact market value determination had been necessary. Furthermore, our *Brookins* discussion of "market value" under 18 U.S.C. § 659 does not determine the meaning of "market value" under U.S.S.G. § 2Q2.1(b)(3)(A), which is specifically given the meaning of

---

**5.** Charles Bepler, a Special Agent for the USFWS in Miami, Florida, who was involved in investigating the illegal importation and sale of pancake tortoises in Florida, testified at Eyoum's sentencing hearing that the prices for smuggled animals (and pancake tortoises in particular) rise as they go from smuggler to wholesaler to retailer.

"fair-market retail value" under the application notes.

In *United States v. Clark*, 986 F.2d 65 (4th Cir.1993) (upholding use of defendant's own estimate of market value of illegal tiger skin rugs for calculating market value under § 2Q2.1(b)(3)(A)), and *United States v. Atkinson*, 966 F.2d 1270 (9th Cir.1992) (upholding use of defendant's price for illegal hunting expedition for calculating market value of animal killed during guided hunt under § 2Q2.1 (b)(3)(A)), *cert. denied*, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993), defendants were held responsible (over their own objections) for the illegal price at which they had offered the illegal goods. In those cases distinct retail prices were not reasonably available, and the district court was entitled to estimate the market value prices by the information that was available. *See* U.S.S.G. § 2Q2.1 App. Note 4 ("Where the fair market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information ..."). The fact that poachers, thieves, and smugglers can be held accountable at sentencing for the price at which they value their own merchandise does *not* mean that a court cannot determine that the fair-market retail price of the illegal goods was *greater* than the price such persons personally received for the goods. The price the crook received may be a floor at sentencing, but it is not a ceiling. *See also United States v. Borden*, 10 F.3d 1058, 1063 (4th Cir.1993) (looking to market value of the illegal goods, rather than the defendant's profit in selling them).

■ Eyoum also complains that the district court's calculation of the market value of the tortoises resulted in an inflated price. We review such factual findings only for clear error. *United States v. Banks*, 78 F.3d 1190, 1208 (7th Cir.1996); *United States v. Hickok*, 77 F.3d 992, 1007 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996). The district court's finding that the pancake tortoises were worth $298 each was determined by averaging the pancake tortoise prices from the price lists of five reptile dealers—four in Florida and one in Texas. In addition, Special Agent Bepler of the Miami USFWS testified that $298 was a fair retail price for pancake tortoises in Florida. Eyoum did not offer any price lists beyond those put forward by the government, choosing to rely instead on his argument that $50 was the proper market value.

Eyoum complains that the $298 price determination was clearly erroneous because the price lists that were averaged 1) included prices for pancake tortoises that were "captive raised" and "captive bred," 2) included non-retail prices, and 3) included a price list from a Texas dealer, though Eyoum never sold any tortoises to Texas dealers. "Captive bred" tortoises are tortoises that were hatched and raised in captivity. "Zoo raised" and "captive raised" tortoises are tortoises that may have been born in the wild, but have been raised in captivity. Eyoum maintains that such tortoises are substantially more expensive than tortoises that are simply caught, imported, and sold because the imported tortoises were not fed and cared for from a young age and are more likely to be scarred or irregular in markings. There are two major problems with Eyoum's argument. First, the government put on evidence at sentencing that advertising imported tortoises as "captive bred" was a common ruse among reptile dealers for selling tortoises for which they did not have legal papers, in order to avoid detection of illegal importation activities and garner higher prices.[6] In fact, Agent Bepler testified that when he investigated Rian Gittman of The Reptile Service, to whom Eyoum had sold his tortoises, Gittman admitted that though he advertised captive bred tortoises, he sold only imported tortoises and had never bred pancake tortoises or purchased captive bred tortoises. Second, even if the court had looked only to the price list of The Reptile Service itself, at which adult pancake tortoises were advertised at $175 each (with certain volume discounts),[7] the overall market value of 131 tor-

---

**6.** In addition, Eyoum acknowledges in his brief that when demand is high and supply is low, the market value of imported tortoises may equal that of captive bred tortoises.

**7.** The Reptile Service advertised captive born babies at only $150 each, but Eyoum can hardly ask us to look to this price when he objects to the

toises at this price would be $22,925, i.e., still in the four-level enhancement range.

Eyoum's argument that some of the prices used were wholesale prices, rather than retail prices, is a strange one, since he does not deny that wholesale prices are generally *lower* than retail prices. Thus the use of wholesale prices could only have decreased the overall average price, potentially benefitting Eyoum by resulting in a lower overall market value and corresponding enhancement range.

Finally, the use of the price list from the Texas dealer had no impact on Eyoum's sentencing enhancement and so did not prejudice him. If the average pancake tortoise price is calculated using only the Florida dealers, the overall market value would still have been in the $20,000–$40,000 range, resulting in the same four-level enhancement. Furthermore, Eyoum did not propose any alternative prices lists or an alternative fair-market retail price. We conclude that the district court's calculation of the four-level market value enhancement under U.S.S.G. § 2Q2.1(b)(3)(A) was proper and not clearly erroneous.

■ Eyoum also challenges the two-level enhancement of his sentence under U.S.S.G. § 2Q2.1(b)(2), which states: "If the offense (A) involved fish, wildlife, or plants that were not quarantined as required by law; or (B) otherwise created a significant risk of infestation or disease transmission potentially harmful to humans, fish, wildlife, or plants, increase by 2 levels." The district court found that Eyoum's importation of tortoises with a carapace length of less than four inches created a significant risk of infestation or disease to humans. The court based this finding on 42 C.F.R. § 71.52, the public health regulation prohibiting the importation of viable turtle eggs and live turtles with a

carapace length of less than four inches.[8] The regulation went into effect in 1975, after it was determined through epidemiological studies that small pet turtles were a significant source of Salmonella and Arizona bacteria. These studies estimated that some 280,000 human cases of salmonellosis per year were turtle associated. Mitchell L. Cohen et al., *Turtle–Associated Salmonellosis in the United States: Effect of Public Health Action, 1970 to 1976*, 243 JAMA 1247 (1980). Children were found to be particularly susceptible to sickness due to Salmonella and Arizona bacteria carried by their pet turtles. The federal public health regulation, which followed various local and state attempts to regulate the sale of turtles as pets, *id.*, was designed to address this serious health problem.

The district court relied on the 42 C.F.R. § 71.52 prohibition to find that Eyoum's offense created a significant risk of infestation or disease under U.S.S.G. § 2Q2.1(b)(2). Eyoum objects to the two-level enhancement of his sentence under this section, arguing that the government did not establish that *his* offense created such a risk. He points out that the under-four-inch tortoises he imported were not actually tested for Salmonella or Arizona bacteria and that if they did not carry any such bacteria, they did not pose any risk of infestation or disease—let alone a *significant* risk of infestation or disease. He maintains that the district court improperly focussed on potential rather than actual risk.

■ We conclude that U.S.S.G. § 2Q2.1(b)(2) does not require the government to establish that the specific animals or wildlife involved were actually diseased or infested. Where a federal public health regulation forbids the importation of a whole category of animals due to the substantial risk that they will spread illness-causing bac-

---

use of other price lists that advertise captive bred and captive raised tortoises.

8. "Turtles" is defined in the regulation to include turtles, tortoises, and terrapins. 42 C.F.R. § 71.52(a). The regulation allows for the legal importation of viable eggs and live turtles under four inches in carapace length only 1) in lots of less than seven for non-commercial purposes and 2) for bona fide scientific and educational pur-

poses, when accompanied by a permit. A permit application must include, among other things, "the precautions to be undertaken to prevent infection of members of the public with Salmonella and Arizona bacteria." 42 C.F.R. § 71.52(d). And a permit will be issued only upon a finding that the holder of the permit will implement adequate precautionary health measures in this regard. 42 C.F.R. § 71.52(e).

teria, a district court can reasonably conclude that the illegal importation of such animals creates a significant risk of infestation or disease. This interpretation corresponds with the language of § 2Q2.1(b)(2), which refers to the creation of "a significant *risk* of infestation or disease transmission *potentially* harmful to humans, fish, wildlife, or plants" (emphasis added). Accordingly, the government need not prove that the offense conduct actually resulted in disease transmission or that it was necessarily harmful or dangerous to people, plants, or animals. The public health regulation itself represents an administrative finding that the commercial importation of small turtles—because they are likely to be sold as pets for children—creates a significant risk of disease to humans.[9] The district court was entitled to rely on this regulatory conclusion to support the two-level enhancement in Eyoum's sentence.

For the foregoing reasons, we AFFIRM the district court's enhancement of Eyoum's sentence under U.S.S.G. § 2Q2.1(b).

---

9. The notice in the Federal Register announcing the requirements of the new regulation stated that "[t]he sole objective of this regulation is to protect the public, especially children, from contaminated pet turtles." 40 Fed.Reg. 22543 (May 1975) (codified at 42 C.F.R. § 71.52).