UNITED STATES of America,
Plaintiff–Appellee,

v.

Damone JACKSON, Mark R. Jackson,
and Kerry Stephans, Defendants–
Appellants.

Nos. 95–3060, 95–3344 and 95–3417.

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1996.

Decided Sept. 4, 1996.

Barry Rand Elden, Chief of Appeals, Mark Filip (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for the U.S. in Nos. 95–3066, 95–3344 and 95–3417.

David W. Gleicher (argued), Chicago, IL, for Damone P. Jackson in No. 95–3060.

Jeffrey J. Levine (argued), Chicago, IL, for Mark R. Jackson in No. 95–3344.

Robert A. Korenkiewicz (argued), Chicago, IL, for Kerry Stephans in No. 95–3417.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Damone Jackson, Mark Jackson, and Kerry Stephans were all convicted of wire fraud, under 18 U.S.C. §§ 1343 and 2, for their involvement in a fraudulent telemarketing scheme. Damone Jackson pled guilty and testified against Mark Jackson and Stephans at a joint jury trial, which resulted in the convictions of both men. The three men appeal various enhancements to their respective sentences under the Sentencing Guidelines, and Stephans also appeals the denial of a minor participant reduction in the determination of his sentence. We affirm.

## I.

Damone Jackson initiated the telemarketing scam in Chicago, Illinois in the fall of 1989 under the name "Midwest Marketing" ("Midwest"). In early 1990 Damone Jackson, who lived in Los Angeles and ran another telemarketing company there, recruited his nephew, Mark Jackson, then age eighteen, to oversee Midwest's operations in Chicago. Although Damone owned the Chicago company, received the funds collected, and sent employee pay checks from California, Mark was in charge of hiring, firing, and supervising Midwest employees in Chicago. He also handled "customer complaints." After Mark Jackson initially worked for Midwest for about two months, the Chicago operations ceased until he again started up the business in August or September of 1990. Kerry Stephans began working for Midwest in September of 1990 and worked through January of 1991. In October of 1990, Damone Jackson decided to expand Midwest's business, and he and Mark Jackson hired additional telemarketers to work for them in Chicago. Midwest remained in business until April of 1991.[1]

While the exact nature of the scheme varied over time, the "prizes" changed somewhat, and different company names were used, the Midwest program basically worked as follows. Damone Jackson would purchase "lead lists" from other companies. These lists contained the names of persons who had previously bought products from telemarketers and included each customer's name, ad-

---

1. Damone Jackson learned of the federal investigation into Midwest's operations in March 1991. Both Jacksons were involved in other fraudulent telemarketing businesses after April 1991, in which the operations essentially mirrored those at Midwest. These activities were also revealed at trial and considered at sentencing, but for the sake of simplicity, we will focus (as the parties do) on the operations of the Midwest company.

dress, telephone number, and information on the earlier purchase. Such persons were then contacted by Midwest and informed that they were "guaranteed winners" of one of five prizes. In accordance with the typical telemarketer's script, which was prepared by Damone Jackson, persons would then be told that the five possible prizes included: 1) a Mazda Miata, 2) $5000 in cash, 3) five dream vacations, 4) a home entertainment center, and 5) $1000 in cash. The "winners" were then told that in order to receive their prize they would simply have to pay certain promotional fees and taxes on the prize. The telemarketers made a "sale" when someone agreed to pay these fees and taxes. Of course none of this money actually went to pay any promotional fees or taxes, and the "customers" were never told that they were purchasing anything.[2] The money taken in was actually used to pay for the "prizes," the operating expenses of the business, employee salaries (which were based on commissions), and a nice little profit for Midwest itself.

After persons sent in their money, they would generally receive five vacation vouchers, though some persons were sent a bracelet and many received nothing at all. Midwest never really held any "contests," and no one ever received cash or a car. Persons were instructed to send their checks to Midwest in Chicago, where the money was deposited in a Chicago bank, and then Damone Jackson would ship the goodies from California. Some persons were told what their prize would be, while others agreed to send in the requested money without knowing which of the items they were going to receive.

All of the prizes sent were purchased by Midwest for substantially less than the amount requested for fees and taxes. For example, Damone Jackson testified that he would purchase the vacation packages for $45 and the bracelets for $50 from Premium Research, a company that specialized in selling such items to telemarketers. Persons who "won" these prizes, however, were asked to send in more than $200 for taxes and fees. (According to the defendants the average amount requested for the vacation package was $249.49.) Various witnesses testified that they were quite disappointed by the vacation packages they were sent, since the five one-week packages did not include airfare or any transportation expenses, did not cover food, taxes, or other costs, and had other restrictions. Essentially the "packages" were certificates for one week of lodging at specific hotels, in specific cities, with no guaranteed availability. Some victims maintained that they considered the vouchers worthless.

Telemarketers for Midwest would keep track of their sales with sales order forms. A typical sales order form indicated the date of the contact, the telemarketer's real name, any aliases used on the phone with a particular customer,[3] the customer's name, address, and telephone number, the amount charged to the customer, and the item that was to be sent. When employees of Midwest were paid, they would receive a "commission statement" along with their paychecks. These statements informed the telemarketers of the date on which a particular customer's check was received, the customer's name, the amount the customer paid, Midwest's deduction for overhead expenses (7 percent of the amount paid by the customer), and the actual cost to Midwest of the item sent to the customer. The telemarketer's commission was then 25 percent of the amount paid by the customer, after the cost of Midwest's overhead and the item itself were deducted. Thus all telemarketers who worked for Midwest were informed of the price paid by Midwest for the items being sent.

Midwest also used a technique that employees referred to as "reloading." Certain customers who had previously sent in money would be re-contacted and informed that they were *again* lucky winners of a contest. This time customers were asked to pay more than $400 in taxes and fees. Such customers

---

**2.** We use the word "customer" throughout this opinion to refer to the victims of the defendants' scheme, though we caution the reader to keep in mind that these persons considered themselves to be winners, not customers.

**3.** Telemarketers for Midwest typically used aliases when contacting potential customers.

were generally promised an item like a "home entertainment center."[4] Only experienced telemarketers, including both Mark Jackson and Stephans, were allowed to reload customers. Customers that were successfully reloaded were referred to by Midwest employees as "reloads" and "mooches." Damone Jackson testified that "mooches" are people who "just can't say no." Telemarketers were required to indicate on their sales order forms when a customer was a reload. If a reload was told that he or she had won a specific prize, that information would be included on the order form.

Various victims of the telemarketing scam testified at trial, including persons who had been reloaded. The story of one such victim, "J.Z.," a car salesman in Stevens Point, Wisconsin, is particularly noteworthy. When J.Z. was first contacted by Midwest in November of 1990, he was told that he had won a car. J.Z. eventually agreed to send Midwest a check for $274.10 to cover taxes and the cost of shipping the car to Stevens Point. He received nothing. J.Z. wrote an additional check to one of the Jackson telemarketing companies (MJ Enterprises, Mark Jackson's company) on September 20, 1991, this time for $735. J.Z. could not remember the circumstances surrounding the sending of this check.[5] In January of 1992, J.Z. was contacted by another Midwest successor company (Diversified Incentives, run by the two Jacksons and a third person) and told that he was a guaranteed winner of three of five fabulous prizes, prizes grander even than those on the original Midwest list. This time the telemarketer faxed him a list of the prizes and assured him that his cash winnings would cover the amount of the taxes and fees. J.Z. agreed to send in $1895 and wrote two checks totalling this amount. Finally, in May of 1992, J.Z. was again contacted by Diversified Incentives, told that he had won four of seven listed prizes, promised that he had won at least $1000 in cash, and told to send in $947. J.Z. did so; and as in all of the preceding cases, he received nothing.

On March 14, 1995, a federal grand jury returned a nineteen-count indictment charging Damone Jackson, Mark Jackson, Deangelo Goodlet,[6] and Kerry Stephans with assorted acts of wire fraud. On May 12, 1995, Damone Jackson pled guilty to one count of the indictment (he was charged in all nineteen) and agreed to testify against Mark Jackson and Stephans, in exchange for the dismissal of the remainder of the counts against him. The trial occurred on June 19–23, 1995. The jury returned its verdict on the same day it was instructed and convicted Mark Jackson of thirteen counts of wire fraud and Stephans of one count of wire fraud. Damone Jackson was sentenced to 27 months of incarceration, followed by three years of supervised release, and was ordered to pay $30,000 in restitution and a $50 special assessment. Mark Jackson was sentenced to 57 months of incarceration, followed by three years of supervised release, and was ordered to pay $20,000 in restitution and a $650 special assessment. Stephans was sentenced to 57 months of incarceration, followed by three years of supervised release, and was ordered to pay $8000 in restitution and a $50 special assessment.[7]

---

4. Of course the item that was actually sent was a highly disappointing "entertainment center." The unit was essentially a "boom box" that included a small black and white television. One of the customer-victims testified that when he agreed to send in $840.16 for taxes and fees on a "home entertainment center" and an "IBM laser PC-3" computer, he was expecting to receive a large entertainment center and a computer that were worth over $2000. (The computer received was not an IBM and was not made to accept a disk.) The entertainment box was purchased by Midwest from a company named Premium Connection for $129.

5. J.Z. testified that he was suffering from lyme disease at the time, which took away a lot of his memory. There is no indication in the record that any of the defendants were aware of his illness.

6. Goodlet worked as a telemarketer in Los Angeles as part of Damone Jackson's parallel operations there. A warrant was issued for his arrest in conjunction with the return of the indictment, but the warrant remained outstanding at the time of trial. Consequently, Goodlet is not involved in this appeal.

7. Although Stephans' involvement in the scheme was much less than that of both Jacksons, his substantial criminal history placed him in Criminal History Category IV (while the Jacksons were both in Category I).

## II.

The defendants make a number of challenges to the calculation of their sentences, which will be taken up in turn. Mark Jackson and Kerry Stephans challenge the district court's determination of the amount of loss caused by their crime under § 2F1.1(b)(1) of the Sentencing Guidelines. Section 2F1.1 applies to crimes of fraud and deceit. If the crime caused victims loss of over $2000, the sentence is enhanced according to the amount of loss caused. U.S.S.G. § 2F1.1(b)(1). The district court found that Mark Jackson's involvement in Midwest and parallel ventures caused approximately $565,000 in losses to victims, resulting in a ten-level enhancement, and that Stephans' involvement made him responsible for approximately $125,000 in losses, resulting in a seven-level enhancement. *Id.* These loss figures were calculated by subtracting the cost of the prizes sent from the total money collected from victims during the time periods that Mark Jackson and Stephans worked for Midwest. The two maintain that the loss figures should have been determined by subtracting the *value* of the prizes awarded, not simply their cost to Midwest.

While we review a district court's factual finding of the amount of loss only for clear error, the definition of terms like "loss" under the Guidelines is a legal determination that we review *de novo*. *United States v. Barrett*, 51 F.3d 86, 89 (7th Cir.1995); *United States v. Holiusa*, 13 F.3d 1043, 1045 (7th Cir.1994); *see also United States v. Eyoum*, 84 F.3d 1004, 1007 (7th Cir.1996). By challenging the method by which the district court calculated "loss" in this case, Mark Jackson and Stephans are essentially challenging how the district court defined the term "loss." Thus we review the district court's method *de novo*. *See United States v. Clemmons*, 48 F.3d 1020, 1024–25 (7th Cir.1995).

The Application Notes to Guidelines § 2F1.1 state that "loss is the value of the money, property, or services unlawfully taken...." U.S.S.G. § 2F1.1 note 7. In a section titled "Fraud Involving Misrepresentation of the Value of an Item or Product Substitution," the Notes state as follows:

A fraud may involve the misrepresentation of the value of an item that does have some value.... Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock was overvalued (*i.e.*, $30,000). In a case involving a misrepresentation concerning the quality of a consumer product, the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received.

U.S.S.G. § 2F1.1 note 7(a). The Application Notes also recognize that "[t]he offender's gain from committing the fraud is an alternative estimate [for calculating loss] that ordinarily will underestimate the loss." U.S.S.G. § 2F1.1 note 8. The district court essentially calculated loss by treating the telemarketing scam as a sale in which the value of the goods was misrepresented and then determining the defendants' profit from these "sales": (amount collected for goods) minus (actual cost of goods to seller) equals (seller's gain).

Mark Jackson and Stephans argue that the prizes, specifically the vacation vouchers (they don't address the other prizes), were worth more than the $45 that Damone Jackson testified was paid for them and that this number, i.e., the "value" of the prizes, should have been subtracted from the amount paid by the customer to determine the loss caused.[8] They claim that "the cost

---

8. Prior to sentencing Mark Jackson and Stephans also objected to the pre-sentencing report's calculation of the total amount collected from customers for prizes. They argued that the court should not simply look at the deposits made to Midwest's bank accounts, since Damone Jackson testified at trial that he would sometimes transfer money between accounts, which could result in double-counting or the inclusion of deposits from legitimate ventures. The defendants do not raise this issue in their consolidated appellate brief, however; hence it is waived. Their attempt to resurrect the issue in their reply brief is too late. In addition, they present no evidence that any of the deposits to the Midwest accounts came from sources other than customer payments.

of vacation/travel lodging is a matter of common awareness" and that the five one-week lodging packages were certainly worth more than $45.[9] While the defendants never attempted to provide the lower court with any specific number at which to value the vouchers—or any information on lodging costs whatsoever—they essentially argue that the vouchers were worth at least the $249.49 that their "customers" were typically asked to pay in order to receive them. We note that under such an optimistic analysis, the victims suffered *no* financial loss, since the vouchers were worth what they paid. The defendants point out that Midwest bought the vouchers in volume, which likely allowed the company to garner a wholesale price not available to individual customers—further reason to doubt that they were worth a mere $45. We conclude, however, that the district court's valuing of the vouchers at $45, which is a factual determination that we review only for clear error, was very reasonable and not clearly erroneous. The $45 amount was a reasonable estimate of their market value, i.e., "the amount for which the victim could resell the product received," especially when the defendants themselves offered no other evidence of market value. The only evidence before the court of the price paid by a willing buyer to a willing seller for the vouchers was the $45 price paid by Midwest to its supplier.

We also find that the district court's method of calculating the loss to Mark Jackson and Stephans' victims was a conservative method about which the defendants should have no complaint. The court's focus on the gain to the defendants may well have *underestimated* the loss to their victims, a phenomenon noted in the Application Note quoted above. The government argues that the court could have found the value of the vouchers to be $0, since various victims maintained that the vouchers were valueless to them (because travel and other expenses were not included, etc.). *See United States v. Austin,* 54 F.3d 394, 402 (7th Cir.1995) (affirming district court's finding that $0 was best estimate of value of certain art forgeries). In fact, while responding to Stephans' objection at sentencing, the district court itself described the vouchers as "practically valueless." More significantly, Mark Jackson and Stephans completely ignore the fact that the victims never agreed to *buy* anything. They agreed to send in "taxes and fees" on "prizes" they had won. The victims believed that they would be receiving something worth substantially more than the money sent in. After all, how could taxes and fees on a prize amount to more than the cost of the prize itself? Thus the loss to these victims, in terms of the difference in value between what they expected to receive and what they actually received, was arguably much greater than the money the defendants made on the deal.[10] *See United States v. Mount,* 966 F.2d 262, 265 (7th Cir.1992) (noting that Guidelines § 2F1.1 "call[s] for the court to determine the net detriment to the victim rather than the gross amount of money that changes hands"); *see also United States v. Mau,* 45 F.3d 212 (7th Cir.1995). The district court's method of calculating the loss caused to the victims was conservative, reasonable, and quite fair to Mark Jackson and Stephans. *See United States v. Gennuso,* 967 F.2d 1460, 1462 (10th Cir.1992) (affirming use of "out-of-pocket" method for calculating loss to victims in factually similar telemarketing scam: "the amount the victim gave up decreased by the value of the property the victim received in return," using wholesale purchase price paid by defendant as value of property received).

### III.

All three defendants received an enhancement under the Sentencing Guidelines for targeting "vulnerable victims." Under the Guidelines the defendant's offense level must be increased by two levels "[i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition,

---

**9.** The defendants maintain that the vouchers actually cost Midwest $60, but they do not argue that the $15 difference would have changed their respective sentencing enhancements.

**10.** We are not here finding that such an "expected value" approach would be proper under the Guidelines; we simply note that the monetary loss to these victims likely "felt" greater to them than the amount charged to the defendants.

or that a victim was otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b). The district court made a number of statements at the sentencings of the three defendants that explain its decision to apply the vulnerable victim enhancement over the defendants' objections. The court focussed on the technique of reloading customers who had earlier fallen prey to the defendants' scheme. The court found as follows:

> [R]epeat approaches were made to victims who [had] proven to be very susceptible to this telemarketing scheme. In fact, the defendants had terms for these people, "moochers" is one, I think, that comes to mind, "reloading" and "moochers." So the insiders operating this scheme were quite aware and intentionally targeted people they knew were vulnerable or susceptible to the scheme.... And I say this after having seen and heard some of the victims testify.

The court found that reload victims were neither sophisticated nor wealthy and that they were targeted because of their vulnerability to the defendants' plot: "[T]he evidence certainly established, as well as the testimony of Damone Jackson, that they were targeted because they were easy marks and proved themselves to be, repeatedly." The court noted that the victims who testified were embarrassed by their own "gullibility" in falling for the telemarketing scam. During Damone Jackson's sentencing the court commented:

> There are people who are vulnerable to con-artists. And I think it's fair to use that term in this case.... I saw not just [J.Z.] but several other victims who seemed to be very trusting and were repeatedly called by [Damone] Jackson and his friends using different corporate identities, and they continued to send money in. It was like the old expression, throwing good money after bad.

The court concluded, "Well, I think we had more than a dragnet type of scheme here. I think we had a very innovative and clever way of identifying victims in this case and repeatedly victimizing some of the same people by using different corporate identities."

We review a district court's factual finding that a defendant preyed on vulnerable victims only for clear error. *United States v. Sutherland*, 955 F.2d 25, 26 (7th Cir.1992). We have previously noted that "'vulnerability' is the sort of fact which the trial court is peculiarly well-positioned to gauge...." *United States v. White*, 903 F.2d 457, 463 (7th Cir.1990) (quoting *United States v. Mejia–Orosco*, 868 F.2d 807, 809 (5th Cir.1989)). In order to apply the § 3A1.1(b) enhancement, the district court must find both 1) that a victim of the defendant's crime was unusually vulnerable in some way, and 2) that the defendant targeted that victim because of this vulnerability. *Id.; United States v. Singh*, 54 F.3d 1182, 1191 (4th Cir.1995). A person can be "unusually vulnerable" due to a characteristic like age or physical or mental handicap, or due to some other characteristic that makes that person "particularly susceptible" to the defendant's crime. U.S.S.G. § 3A1.1(b). The Application Notes to the vulnerable victim provision help clarify the "targeting" requirement by directing as follows:

> The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim. But it would not apply in a case where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.

U.S.S.G. § 3A1.1 note 2. Thus in a case like the one at hand, the district court must have focussed on whether the defendants *targeted* vulnerable victims, not whether vulnerable persons just happened to be defrauded. As we noted in *Sutherland*, the § 3A1.1(b) enhancement "is designed to punish criminals who *choose* vulnerable victims, not criminals who target a broad group which may include some vulnerable persons." 955 F.2d at 26 (emphasis in original); *see also United States v. Smith*, 39 F.3d 119, 124 (6th Cir.1994) ("[T]he evidence must show that the defendant knew his victim was unusually vulnerable and that he perpetrated a crime on him because he was vulnerable.").

It is clear from the statements of the district court that it determined that the reloaded victims were unusually vulnerable because they were particularly susceptible to this kind of fraud. Whether these persons are described as gullible, overly trusting, or just naive (and whatever the cause of this condition), the district court clearly determined that their readiness to fall for the telemarketing rip-off, not once but *twice* (and in J.Z.'s case, four times), demonstrated that their personalities made them vulnerable in a way and to a degree not typical of the general population. The court did not find that all of the victims of the defendants' scheme were unusually vulnerable, just those who were successfully reloaded.[11] This finding was amply supported by the evidence put forward at trial, which included the testimony of reloaded victims, and was not clearly erroneous.[12]

The district court also clearly found that the defendants—all of whom participated in the reloading scheme—targeted the "reloads" because of their unique susceptibility. The structuring of the reloading process, the designating of customers as "reloads," the use of the term "mooches" for people who "just can't say no," the charging of higher sums to reloads, and the systematic re-victimizing of people like J.Z. amply demonstrate that the defendants believed the reloaded persons to be especially vulnerable and that they specifically targeted them because of this vulnerability. The court noted that this was not a general "dragnet type of scheme," i.e., it was not analogous to the example in the Application Notes about a general mailing of fraudulent securities victimizing certain vulnerable individuals. The district court did not rely simply on the defendants' use of telemarketer "lead lists" to support the § 3A1.1(b) enhancement—and we need not decide whether using such lists by itself constitutes targeting vulnerable victims. Rather, the court focussed on the reloading process, and its finding that this reloading exemplified the targeting of unusually vulnerable victims was not clearly erroneous.

Some might argue that you can hardly blame these defendants for having the "good business sense" to prey upon persons who were the easiest to victimize. As the district court recognized, from the standpoint of the overall financial success of their venture, the reloading tactic was very efficient and highly profitable. It is clearly the intent of the § 3A1.1(b) enhancement, however, to punish such optimizing behavior more harshly. And ultimately it is quite reasonable to punish the "clever crooks" more harshly, both because they may be more dangerous and in order to give special protection to the most vulnerable among us. The vulnerable victim enhancement given these defendants was well-suited to the purposes of § 3A1.1(b).

## IV.

Mark Jackson appeals the district court's enhancement of his sentence for obstruction of justice under § 3C1.1 of the Guidelines. The obstruction enhancement states: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." U.S.S.G. § 3C1.1. The Application Notes to § 3C1.1 list a number of examples of obstructive conduct, including

---

11. We note that the Guidelines do not imply that all of the victims must have been unusually vulnerable in order to apply the enhancement. It is enough if the defendant targeted any of the victims because of their unusual vulnerability.

12. The defendants maintain that our decision in *Sutherland*, where we vacated a vulnerable victim enhancement, mandates that we also reject the enhancement in their case. The specific evidence of vulnerability and targeting in this case, however, distinguishes it from *Sutherland*. In that case the district court "based the sentence on broad and unsupported generalizations about elderly veterans' nostalgia regarding their wartime experiences." 955 F.2d at 27. The *Sutherland* district court simply assumed the victims were elderly, though the Vietnam veterans would not have been, and assumed that aging vets would be an easy mark for the defendant's memorabilia scam, though one might argue that "because old veterans tend to be very attached to their memorabilia, they are unusually *invulnerable* to such a fraud." *Id.* (emphasis in original). Unlike in *Sutherland*, the district court's findings in this case were amply supported by specific evidence of vulnerability and targeting.

the following: 1) "providing materially false information to a judge or magistrate," and 2) "providing materially false information to a probation officer in respect to a presentence or other investigation by the court." U.S.S.G. § 3C1.1 notes 3(f) and 3(h). We review a district court's factual finding that a defendant obstructed justice only for clear error. *United States v. Johnson*, 46 F.3d 636, 638 (7th Cir.1995).

■ The government argues that we need not address Jackson's obstruction enhancement because the district court stated that it would have imposed the same sentence even without the obstruction enhancement. It is true that we need not review a district court's decision to grant or deny a particular enhancement if the sentencing ranges (with and without the enhancement) overlap and the court made clear that it would impose the same actual sentence whether the enhancement was given or not. *See, e.g., United States v. Mount*, 966 F.2d 262, 265 (7th Cir.1992) ("An appellate court may be confident that the choice of range did not affect the sentence when the district judge says so.") At Mark Jackson's sentencing the district court stated as follows:

I will take into consideration your age, the fact that the money attributed to you would be on the low end of the range of $500,000–$800,000, and impose a sentence that would be within the range had I not increased your guideline level for obstructing justice. And that would be 57 months. Fifty-seven months, as I calculate it, would be the high end of the Guideline range had I not increased for an obstruction of justice. And I think that had I not increased for obstruction of justice, the 57 months would be fully justified based on your conflicting statements and positions. However, under all the circumstances, I think 57 months would be appropriate now at the low end of the Guideline range after having applied obstruction.

We read this statement as strongly implying, without ever actually stating, that the court would have imposed a sentence of 57 months (which was in the Guidelines range whether or not the obstruction enhancement was applied) regardless of whether it determined that Jackson had obstructed justice. An explicit statement in this situation is certainly

preferable. We will not decide the close question of whether the court's remark was clear enough, however, because we are convinced that the court's determination that Jackson obstructed justice was not clearly erroneous.

Prior to sentencing Mark Jackson submitted a sentencing memorandum to the district court and attached a copy of a letter previously sent by his counsel to the probation officer, which made certain objections to the presentence investigation report. The government maintains that Jackson attempted to obstruct justice by making materially false statements in this letter regarding his involvement with the telemarketing scheme. After hearing argument from both sides on the issue at sentencing, the court stated:

I do find that the preponderance of the evidence establishes that Mr. Jackson willfully and intentionally attempted to obstruct justice; that is, to affect the sentencing process directly by falsely asserting positions contrary to his own earlier admissions in his proffer. And I find his position incredible in terms of the assertions that he makes in the sentencing memorandum. I find them incredible based on the trial testimony and based on the objective documentary evidence. So two levels will be added for obstruction.

The government asserts that a number of materially false statements were made by Jackson in the letter to the probation officer (later submitted to the district court) that justify the obstruction enhancement. A single example will here suffice to show the basis for the enhancement.

The letter to the probation officer stated that Mark Jackson "was unaware that his uncle never had automobiles and cash to give as Damone Jackson was entirely responsible for shipping all prizes." According to the government's version of Mark Jackson's earlier proffer to the FBI, however,

MARK JACKSON knew from the beginning, there never was a chance for the victims to win a car or the large cash awards. JACKSON stated, "I knew they (victims) weren't going to get anything big." JACKSON justified his actions because the people did receive "one of five," even though there was never a possibility to receive the expensive awards.

Even the defendant's own version of his proffer is inconsistent with the position taken in the letter to the probation officer:

Mark was aware that people were told there was a contest which was not true, and near the end Mark realized that a lot of people were not being shipped or receiving anything. Mark also became aware that people would not win a car and repeatedly asked Damone "how can you do this." Mark stated that no one would receive a car and there would be only one award, that it would be either the bond, the vacation, or the computer. Mark stated that he was justified in his mind with giving one of the awards.

The district court was certainly entitled to conclude that the statement in the letter to the probation officer that Mark Jackson was "unaware" that no cars or cash were being awarded was materially false and an attempt to obstruct justice. The finding was not clearly erroneous.[13]

## V.

■■■■■ Last we come to Kerry Stephans' claim that the district court erred in denying him a sentencing reduction for being only a "minor participant" in the telemarketing scheme. Section 3B1.2(b) of the Guidelines provides that a defendant is entitled to a two-level reduction in his offense level "[i]f the defendant was a minor participant in [the] criminal activity." U.S.S.G. § 3B1.2(b). The Application Notes clarify that "a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 note 3. A "participant" is defined as "a person who is crimi-

nally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 note 1. We review a district court's factual finding regarding a defendant's role in the offense under the clear error standard. *United States v. Maggi,* 44 F.3d 478, 482 (7th Cir.1995).

■■■■ At the sentencing stage and on appeal, Stephans has emphasized the relatively short duration of his time at Midwest and how much less culpable he was than Damone and Mark Jackson. A short period of active involvement alone does not, however, entitle a defendant to a minor participant reduction. *See United States v. DePriest,* 6 F.3d 1201, 1214 n. 4 (7th Cir.1993). The real focus must be the nature of the defendant's activities and his role in the overall criminal scheme. *United States v. Cea,* 963 F.2d 1027, 1032 (7th Cir.), *cert. denied,* 506 U.S. 899, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992). Neither the district court nor the government deny that Stephans was much less involved in the Midwest scam than the two Jacksons. In fact, the court found that Damone Jackson was an "organizer or leader" and that Mark Jackson was a "manager or supervisor," and enhanced their offense levels accordingly. U.S.S.G. § 3B1.1(a)–(b). Stephans and the government disagree about how much Stephans' involvement went beyond that of the average telemarketer—whether he "trained" other telemarketers, for example—but ultimately these disagreements do not matter.[14] The government emphasized at sentencing that Stephans was a top telemarketer at Midwest, that he knew what was going on, and that he was as culpable as any of the other telemarketers. The district court concluded that Stephans was "a full participant in the scheme, not a minor one."

---

**13.** Mark Jackson also raises a pseudo-constitutional argument that it was a violation of his Sixth Amendment right to counsel for the court to penalize him for statements made in a letter written by his lawyer. Jackson provides no legal support for this argument, however; and more importantly, he continues to stand by the validity of the statements made in the letter and to assert that they accurately demonstrate why the obstruction enhancement was erroneous. Consequently, we are unable to see how his invocation of the right to counsel has any relevance to his basic complaint about the enhancement itself.

**14.** Lisa Johnson, who worked at Midwest as a telemarketer during the time Stephans was there, testified that Stephans trained her, that Stephans told customers that he was the vice president of the company, and that Stephans was in charge when Mark Jackson was out of the office. Stephans responds that the so-called "training" consisted of giving her the script and telling her to "sound enthusiastic," that he held no leadership role at Midwest, and that another employee testified that no one was in charge when Mark Jackson was out. Stephans maintains that the evidence cannot support a finding that he was anything more than a successful telemarketer paid on a commission basis.

The government argues on appeal that other telemarketers were criminally responsible "participants" in the scheme under the Guidelines and that it does not matter that these persons were not all indicted and prosecuted. In fact, two of the three other Midwest employees who testified were granted immunity in exchange for their testimony. This fact and the apparent nature of the fraud from the script itself and the commission statements—obviously no "contest" was going on, and the "prizes" were not even worth the "taxes and fees" requested—strongly suggest that other telemarketers could have been indicted and prosecuted. Stephans offers no response whatsoever to this argument, and we find it convincing. Stephans' claim that he was basically an average telemarketer at Midwest gets him nowhere, since the average participants in a criminal enterprise are *not* entitled to a minor participant reduction. Stephans was not "less culpable than most other participants," and the court's denial of the minor participant reduction was not clearly erroneous.

For the foregoing reasons, we AFFIRM the district court's calculation of the sentences of Damone Jackson, Mark Jackson, and Kerry Stephans.