**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Rosa CAMERON, Defendant–Appellant.**

No. 03–1511.

United States Court of Appeals, Seventh Circuit.

Submitted June 4, 2003.

Decided Jan. 7, 2004.

184

Michelle L. Jacobs, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Michael J. Steinle, Milwaukee, WI, for Defendant–Appellant.

Before RIPPLE, DIANE P. WOOD, and WILLIAMS, Circuit Judges.

### ORDER

Rosa Cameron, the former executive director of a neighborhood non-profit organization, pleaded guilty to misapplying federal funds in violation of 18 U.S.C. § 666. The district court sentenced Ms. Cameron to eight months' imprisonment. Ms. Cameron now appeals the sentence imposed by the district court.

## I

## BACKGROUND

### A. Facts

#### 1.

Williamsburg Heights ("WH") is an organization engaged in a variety of community-service projects, including after-school programs for children, education, job creation, grass cutting and snow shoveling. It was founded by Ms. Cameron in 1990, and she served as its executive director until April of 2000. In her capacity as executive director, Ms. Cameron reported to WH's Board of Directors.

In 1999, WH had a budget of $257,624 to operate three main programs: 1) grass cutting and snow shoveling funded by a United States Department of Housing and Urban Development ("HUD") grant administered by the City of Milwaukee; 2) Community Learning Centers ("CLC"), an after-school program funded through a federal Department of Education grant administered by the Milwaukee Public Schools; and 3) an after-school/food program funded through a federal Safe & Sound/High Intensity Drug Trafficking Areas ("HIDTA") initiative.[1] The major expenditures of WH were for salaries and expenses associated with each program. The HUD funds were allocated to WH through the City of Milwaukee Community Block Grant Association, and the CLC and Safe & Sound funds were disbursed based on monthly "Project Cost Reports" submitted by WH. These reports were often signed by Ms. Cameron, who certified the expenses and salaries that had been expended. None of the reports in 1999 in-

---

1. In 1999, federal funding represented 95 percent of the WH budget; charitable donations

supplied the remainder of WH's operating funds.

dicated that money was being used for a salary for Ms. Cameron.

Because of the different funding mechanisms, WH used two different bank accounts: one for the grass-cutting/snow-shoveling program and another for the CLC/Safe & Sound projects. WH checks for these accounts required two signatures, usually that of the executive director, Ms. Cameron, and that of the treasurer, Helen Scaife–Perkins. Scaife–Perkins testified that, because she was very busy, she often signed a group of blank checks every four to six months.

### 2.

On June 30, 1998, Ms. Cameron filed documents with the City of Milwaukee declaring her candidacy for alderperson representing the 10th district. She opened a bank account for the campaign on October 4, 1999, using the name "Friends of Rosa Cameron–Rollins" (hereinafter "campaign account"). Applicable campaign finance laws allowed individuals to contribute up to $350 to the campaign. Organizations, including non-profit groups such as WH, were prohibited from contributing to the campaign. However, there was no limit on how much an individual could contribute towards his or her own campaign. Ms. Cameron's campaign account collected $36,601.50 between October 4, 1999, and April 4, 2000, the date of the election.

Through a series of transactions, Ms. Cameron took $28,964 from WH for use in her campaign. She accomplished this by writing checks from WH to herself and then transferring the funds from her personal account to the campaign account.

The first of these transactions occurred on September 30, 1999, when Ms. Cameron signed a WH check (no. 1813) to herself for $4,500. She wrote on the memo section "for back wages."[2] R.14 at 4. The check was deposited in her personal account. Four days later, Ms. Cameron wrote a check from her personal account (no. 5017) to the campaign account for $4,700. Without the WH check, Ms. Cameron would not have had sufficient funds in her personal account to cover the check to the campaign.

On November 2, 1999, Ms. Cameron signed a WH check (no. 2619) payable to herself for $10,000. The check was designated as wages with a withholding calculation putting the gross pay at $11,332. The $10,000 came from CLC/Safe & Sound funds; however, again there was no Safe & Sound or other paperwork showing Ms. Cameron's entitlement to the funds. Ms. Cameron deposited the check in her personal account; the deposit covered a $10,000 check that Ms. Cameron previously had written on October 28, 1999 from her personal account to her campaign account. Records established that Ms. Cameron had a negative balance in her personal account on that date.

On January 20, 2000, Ms. Cameron signed to herself a WH check (no. 2994) for $3,664. No paperwork corresponded with these funds, but WH records show the $3,664 as net wages on $5,000 gross income. Ms. Cameron wrote, that same day, a $3,664 check from her personal account to her campaign account. Without the WH check, she would not have had

---

**2.** The $4,500 came from the CLC/Safe & Sound WH account; no paperwork that was submitted listed a salary for Ms. Cameron. Handwritten notes (which the parties agree were made after the check was issued) show a calculation of withholding, putting Ms. Cam-

eron's wages at "$127.48 × 38 wk = 4844.25." R.14 at 4. The withholding calculated Medicare and Social Security but put zero for state and federal taxes so that the exact amount of net pay was $4,500. *See id.*

sufficient funds in her personal account to cover the check.

Ms. Cameron wrote a fourth WH check (no. 2018) to herself on February 3, 2000, for $5,800 and deposited it in her personal account. Internal WH records listed the $5,800 as an advance. On the same day, Ms. Cameron wrote a check for $5,800 from her personal account to her campaign account. She did not have sufficient funds without the deposit of the WH check to cover the check to her campaign account.

Finally, on March 27, 2000, WH records indicate that two disbursements were made to Ms. Cameron: a $2,000 loan (no. 1906) and a $3,000 advance (no. 3048). Also on March 27, Ms. Cameron deposited the two checks in her personal account and then wrote a $5,000 personal check (no. 5339) to the campaign account.

Prior to the issuance of these checks, Ms. Cameron had received only two pay-checks from WH, both in April of 1999. With respect to these checks, the net amounts were used to offset prior advances (which were outstanding in the amount of approximately $2,200). The first check was for $385, with a net of $337.14, and the second for $577.50, with a net of $533.32.

### 3.

During the time that these events were taking place, Ms. Cameron served, and had served for the past ten years, as the primary care-giver for her severely disabled great-niece. Ms. Cameron's niece has little or no cognitive processing, and she is unable to feed, bathe, or dress herself.

### B. District Court Proceedings

#### 1.

In October 2002, a grand jury returned a four-count indictment against Ms. Cameron: three counts of misapplication of funds, based on the facts recounted above, in violation of 18 U.S.C. § 666, and one count of engaging in a scheme to conceal facts, based on actions taken by Ms. Cameron while serving as an alderperson, in violation of 18 U.S.C. § 2 and § 1001(a)(1). In accordance with a plea agreement reached with the Government, Ms. Cameron pleaded guilty to the first two counts of the indictment, and the Government dismissed the remaining counts.

Following Ms. Cameron's guilty plea, the United States Probation Office prepared a pre-sentence investigation report ("PSR"). The PSR set the base offense level for Ms. Cameron's violation of 18 U.S.C. § 666 at six. See U.S.S.G. § 2B1.1. Furthermore, because Ms. Cameron's violation resulted in a loss of $28,964, the PSR increased the base offense level by four pursuant to U.S.S.G. § 2B1.1(b)(1)(C). Ms. Cameron objected to the increase; she argued that there was not any loss at all because WH had received the value of her services—in essence, "she was entitled to the money as compensation." Appellant's Br. at 9. The court found that the PSR calculation was correct and did not overstate the actual loss to WH. The court explained:

> It is certainly clear to the Court that Miss Cameron treated Williamsburg Heights as her own bankroll. She did not account for a salary. She did not get regular payments as if receiving a salary. And she did not represent in her filings with the Safe & Sound program or other government entities that she was receiving a salary.

R.51 at 20. Further the court found that, after the withdrawals, upon Ms. Cameron's "concern that these deductions might create a problem, Ms. Cameron went back to plug the holes in the paperwork and that she then tried to make it appear as if she was entitled all along to receive the mon-

eys that she misapplied." *Id.* The court stated that it was "therefore, inappropriate to give her the benefit of that after the fact accounting." *Id.*

### 2.

The PSR's calculation also included a two-level increase for Ms. Cameron's role in the offense. According to the PSR, Ms. Cameron had abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense, and, therefore, a two-level increase was warranted pursuant to § 3B1.3. Ms. Cameron objected to this increase as well. She argued that she was not in a position of trust with respect to the Government—the source of the misapplied funds. The district court disagreed with Ms. Cameron's narrow view of position of trust and applied the two-level increase. It explained that Ms. Cameron breached the position of trust she held with respect to WH and to the community:

> To the extent that Williamsburg Heights was representing itself as a charitable organization with responsibilities to its neighborhood and community with a board of directors which takes on the obligation of stewardship, there has to be responsibility on the part of Miss Cameron to the organization, to the Community.

> To the extent that Miss Cameron took moneys from Williamsburg Heights, created paperwork stating how those moneys had been applied and failed to demonstrate her personal entitlement to the money so as to prove to the board and anyone looking at the books and records, especially the accountants and the government entities providing the funds, there was a breach of trust. A breach of trust obviously to the government entity, but more importantly *a breach of trust to the organization which is separate and apart from Miss Cameron....*

> [B]ecause ... there is a board [of directors] I can conclude that Miss Cameron had an obligation not only to herself but to a separate entity.

R.51 at 30 (emphasis added). The court stated that WH was not "the alter ego of Rosa Mae Cameron," *id.*, but that "Williamsburg Heights had a separate identity and that entity ... was owed an obligation of loyalty and honesty. Miss Cameron did not uphold her end of the obligation and to that extent there was a breach of trust," *id.* at 31. Accordingly, the district court imposed the increase for abuse of trust.

In addition to objecting to the PSR's calculation of her offense level, Ms. Cameron also moved for a downward departure based on extraordinary family circumstances, specifically on the fact that she cared for her profoundly disabled niece. *See* U.S.S.G. § 5H1.6. The psychological report that was attached to Ms. Cameron's motion for a downward departure explained that Ms. Cameron's niece cannot hear, communicate or react to painful stimulus; she cannot attend to her own basic nutritional or hygienic needs. Furthermore, she "does not recognize family members" and "does not show emotion toward others." R.33, Ex.1 at 1. In fact, the report stated that "Ms. Cameron reported that [her niece] generally does not respond to [Ms. Cameron] in any way." *Id.* at 1. The report also explained that Ms. Cameron's niece attends a day-care program five days a week for the developmentally disabled. *Id.* Outside of the day-care program, the report stated that "[a]ll self-care activities are done by Ms. Cameron on whom she is totally dependent." *Id.* at 2.

At the sentencing hearing, the district court specifically questioned Ms. Cameron's counsel regarding the likely effect of Ms. Cameron's incarceration on her niece.

Defense counsel indicated that, if Ms. Cameron's niece could not remain in Ms. Cameron's care, she would be placed in a "state agency home." R.51 at 36. Defense counsel also stated that Ms. Cameron's niece had been in the same condition for 12 years with little or no improvement. *See id.* at 37. Finally, with respect to whether placement in a state home would have a detrimental impact on Ms. Cameron's niece, defense counsel stated that he had no facts that full-time placement with the state would have an adverse effect on her condition. *See id.*

In addition to opposing the downward departure for extraordinary family circumstances, the Government sought an upward departure based on three different grounds.[3]

The court denied Ms. Cameron's and the Government's requests for departures. In doing so, it noted that it felt that, out of the "large number of cases where defendants have requested consideration of family obligations as justification for downward departure," Ms. Cameron's "case presents the most compelling request of that nature." R.51 at 52. However, stated the court, because "on the other side of the slate is the government's argument which is very well taken that the defendant should receive an upward departure for her role in this offense and for her involvement with the various checks that were written." *Id.* The court explained that if it were to grant a departure downward in its discretion and likewise a departure upward we would wind up at the same point. And so in my discretion I conclude that it is not appropriate in this case to award either request, I should say to depart upward or downward. It would be a futile effort because we would be in the same place that we are now. And so the request of the government as well as the request of the defense for departures are denied.

*Id.* Accordingly, the district court imposed a sentence of eight months' imprisonment, a term within the applicable guideline range.

## II

## ANALYSIS

On appeal, Ms. Cameron reiterates the arguments made to the district court regarding the calculation of her offense level. She also maintains that the district court abused its discretion in failing to grant her a downward departure on the basis of her care of her niece. In reviewing these issues, "[w]e will not disturb a district court's sentencing decision under the Sentencing Guidelines so long as the district court correctly applied the Guidelines to findings of fact that were not clearly erroneous. However, we review the district court's interpretation of the Sentencing Guidelines de novo." *United States v. Sebero,* 45 F.3d 1075, 1077 (7th Cir.1995) (internal quotation marks and citations omitted).

### A.

U.S.S.G. § 2B1.1 directs a district court to increase a defendant's offense level according to the amount of loss that resulted from the defendant's actions. Under the

---

**3.** The three grounds for an upward departure forwarded by the Government were: 1) the loss amount did not capture the non-economic harm caused by the defendant because the fraud had assisted Ms. Cameron in obtaining a political position, *see* U.S.S.G. § 2B1.1, Application Note 15(A); 2) an enhanced sentence was appropriate because the offense took advantage of societal trust in charitable causes, *see* U.S.S.G. § 2B1.1(b)(7); and 3) Ms. Cameron supervised others in her criminal conduct, although the other parties were not necessarily criminally culpable, *see* U.S.S.G. § 3B1.1, Application Note 2.

guidelines, a loss of more than $10,000 but less than $30,000 corresponds to a four-level enhancement. The district court followed this guideline precisely in increasing Ms. Cameron's offense level from the base of six to the adjusted level of ten.

Ms. Cameron does not argue that the district court applied the incorrect guideline or that a loss of $28,964 does not correspond to a four-level enhancement. Instead, she contends that the amount of funds that she transferred from WH should not be considered a loss because the amount represented wages that she had earned in the service of WH. Ms. Cameron believes that her argument finds support in Application Note 2(E)(i) to U.S.S.G. § 2B1.1, which states:

> (E) *Credits Against Loss.*—Loss shall be reduced by the following:

> The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

*Id.* Because her services as director of WH were valuable services performed before the detection of the illegal scheme, Ms. Cameron argues, the value of those services must be offset against the misapplied amount. When this is done, she maintains that the "loss" amount is zero.

■ We believe that there are several shortcomings in Ms. Cameron's argument. We note initially that Ms. Cameron's argument ignores the fact that she pleaded guilty to misapplication of funds pursuant to 18 U.S.C. § 666.[4] This particular crime does not require conversion of funds to one's own use; it requires only an intentional *misapplication* of funds, even if the funds are used for what would otherwise be a legitimate purpose. For instance, in *United States v. Urlacher*, 979 F.2d 935 (2d Cir.1992), the Second Circuit held that a police chief violated § 666 when "funds were not spent for the purposes allocated," even though a portion of the misapplied "funds were spent for legitimate police expenditures." *Id.* at 937. The court explained:

> Section 666(a)(1)(A) prohibits embezzling, stealing, obtaining by fraud, converting, or intentionally misapplying funds. The first four prohibitions cover any possible taking of money for one's own use or benefit. Intentional misapplication, in order to avoid redundancy, must mean intentional misapplication for

---

4. 18 U.S.C. § 666 states in relevant part:

(a) Whoever, if the circumstance described in subsection (b) of this section exists—
(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that . . .
(ii) is owned by, or is under the care, custody, or control of such organization, government or agency; . . .

shall be fined under this title, imprisoned not more than 10 years, or both.
(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.
(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

otherwise legitimate purposes; if it were for illegitimate purposes, it would be covered by the prohibitions against embezzlement, stealing, obtaining by fraud, or conversion. We reject Urlacher's broad interpretation of § 666(c) as exempting from coverage the intentional misapplication of funds used for otherwise legitimate purposes. That would be inconsistent with § 666(a)(1)(A)'s prohibition against the intentional misapplication of funds.

*Id.* at 938.[5] Similarly, regardless of whether providing Ms. Cameron with a salary would have been legitimate had it been approved and reported, her act of taking the money without the Board of Directors' authorization and without reporting to the oversight agencies was alone sufficient to constitute a violation of 18 U.S.C. § 666(a)(1) for misapplication of funds. *See also United States v. Shelton,* 816 F.Supp. 1132, 1137 (W.D.Tex.1993) (following the *Urlacher* decision and rejecting the argument that § 666 is inapplicable where "the allegedly misused funds were used for an otherwise legitimate purpose").[6]

However, even if funds misapplied for legitimate purposes could be offset against the loss, we believe that there is significant evidence in the record to support the district court's conclusion that the amounts taken from WH did not constitute a salary for services rendered to the organization. Ms. Cameron did not claim to be taking a salary each time she wrote herself a check. On some of the checks, she claimed to take an advance or a loan. Further, the manner in which Ms. Cameron took the funds belies her claim that the funds were meant to be a salary; indeed, the inconsistent amounts of the checks and the irregular intervals at which they were written suggest that the funds did not represent a salary. Finally, no member or committee of the Board of Directors evaluated Ms. Cameron's services or determined an appropriate level of compensation. Ms. Cameron simply took random amounts of money as needed and labeled the funds as wages or advances.[7]

---

**5.** The court held in the alternative that, even if § 666 did not criminalize the misapplication of funds for legitimate yet unauthorized purposes, there was no foundation for such an instruction to the jury because the legitimate expenditures "only totaled approximately $10,000, a small fraction of the $313,868.81 that was missing. No evidence was introduced to show that the rest of the money was spent for legitimate purposes, and therefore, there was simply not an evidentiary foundation for the jury to find in Urlacher's favor on the basis of his proposed § 666(c) instruction." *United States v. Urlacher,* 979 F.2d 935, 938 (2d Cir.1992).

**6.** We had some initial concern that Ms. Cameron's argument with respect to offsetting her loss was an attempt to impeach her guilty plea and that, perhaps, the district court should have made further inquiry into Ms. Cameron's statements to determine whether that was her intent. However, our review of both Ms. Cameron's plea colloquy and her sentencing hearing have resolved our con-

cerns. The record makes clear that, although Ms. Cameron claimed to be entitled to some remuneration from WH, she acknowledged at both stages of the proceedings that she was not entitled to the checks that she received by the method that she received them. R.50 at 40–41. As explained in some detail above, this is sufficient evidence for a conviction of misapplication of funds pursuant to 18 U.S.C. § 666.

**7.** The cases that Ms. Cameron relies upon in support of her offset argument bear little resemblance to the present situation and therefore require only passing comment. In *United States v. Jackson,* 95 F.3d 500 (7th Cir. 1996), a telemarketing fraud case, the district court determined that the amount of loss was the amount paid by the victims less the cost of the prizes that the defendants sent to the victims. The defendants argued on appeal that the amount of loss should be zero; they maintained that, because they had purchased the prizes at a discount, the value of the

Here, Ms. Cameron's use of WH funds has none of the indicia of a salary. The district court did not clearly err in determining that the misapplied funds were not compensation for services rendered and, therefore, in refusing to offset the value of the alleged services against the loss.

**B.**

As set forth above, Ms. Cameron also received an increased offense level pursuant U.S.S.G. § 3B1.1 for abusing a position of trust. U.S.S.G. § 3B1.1 states in relevant part: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission of concealment of the offense, increase by 2 levels." *Id.*

Ms. Cameron argues that, with respect to her misapplication of funds, the Government was the victim. Consequently, because she did not abuse a position of trust with respect to the Government, her offense level should not have been increased. Ms. Cameron relies primarily on *United States v. Trice*, 245 F.3d 1041 (8th Cir. 2001), for her argument.

█ In *Trice*, the defendant, the president of a non-profit corporation, was convicted of making a false statement on a HUD form; specifically, the defendant stated that he never had been convicted of a felony. The Eighth Circuit reiterated that the abuse of trust enhancement " 'applies only where the defendant has abused discretionary authority entrusted to the defendant by the victim . . . .' " *Id.* (quoting *United States v. Garrison*, 133 F.3d 831, 837 (11th Cir.1998)). The court then explained that, in that case, Trice's victim was the United States Government—the entity to which he had made the false statement in order to secure funds for the organization. Because Trice was not in a position of trust with respect to the Government, an adjustment in offense level was not appropriate. *See Trice*, 245 F.3d at 1042.

We do not believe that *Trice* controls Ms. Cameron's case; instead, our analysis is guided by our decision in *United States v. Bhagavan*, 116 F.3d 189 (7th Cir.1997). In *Bhagavan*, we addressed the concept of position of trust in the context of a tax evasion scheme. In that case, the defendant, chief executive officer of a corporation, diverted funds from the corporation to his personal account and failed to declare the funds either as personal or corporate income on his submissions to the Internal Revenue Service. After being

---

prizes was more than the cost. The defendants, however, did not provide "any specific number at which to value the [prizes]"; they merely asserted that the prizes had a value at least as great as the amount paid by the victims. *Id.* at 505–06. We refused to accept that argument and affirmed the sentence calculation of the district court. The defendants in *Jackson* were entitled to offset only the amount they actually spent on the prizes; without evidentiary support, the court would not accept the defendants' arguments that the prizes were of a greater value.

*United States v. Schneider*, 930 F.2d 555 (7th Cir.1991), is equally unhelpful to Ms. Cameron. In that case, the defendants attempted to obtain Government contracts by providing false information; however, they fully intended to perform the contracts at the price and were the low bidders. The Government terminated the contracts before any amount was paid by the Government to the defendants. We held that, based on these facts, the Government could prove some economic loss, for instance, the costs of rebidding the contracts. However, the Government had not presented evidence of such loss. We therefore remanded the case to the district court for recalculation of the defendants' sentences. *See Schneider*, 930 F.2d at 559. In the present case, however, Ms. Cameron did receive and use Government funds, and consequently those funds were not available to WH for its programs.

convicted of tax evasion, the defendant argued that an enhancement for abuse of a position of trust was not warranted because he was not in a position of trust with respect to the Government. We noted that Bhagavan's mistake was to assume that the only victim was the Government; we explained:

> The fallacy in these arguments is the notion that there can be only one victim of a tax evasion scheme—the United States—and thus that the § 3B1.3 enhancement can never apply in tax evasion cases. In [*United States v. Stewart*, 33 F.3d 764 (7th Cir.1994),] we recognized that the same fraudulent scheme might inflict harm on multiple sets of victims—there, both elderly individuals who were trying to arrange in advance for their funerals, and the funeral companies who agreed to provide the services. Under hornbook corporate law, Bhagavan's position as majority shareholder and president brought with it fiduciary duties to act in the interests of the minority shareholders. Thus, in that sense he did occupy a position of trust *vis a vis* the minority, which was a price of his use of the corporate form of doing business. The other shareholders were victims of his scheme to enrich himself and to avoid paying taxes on the secret income: to the extent that the income was diverted from the corporation to Bhagavan's own pocket, it was unavailable for any other lawful corporate purpose. It is enough that identifiable victims of Bhagavan's overall scheme to evade his taxes put him in a position of trust and that his position "contributed in some significant way to facilitating the commission or concealment of the offense." Application Note 1, § 3B1.3.

*Bhagavan*, 116 F.3d at 193 (citation omitted).

The guidelines provide the enhancement for an abuse of a position of a "public or private trust." There is no question that, as executive director of WH, Ms. Cameron was in a position of trust with respect to WH and its Board of Directors. Furthermore, Ms. Cameron's use of the $28,964 to support her campaign diverted those funds from appropriate WH purposes. As in *Bhagavan*, Ms. Cameron occupied a position of trust with respect to the victim, and that victim—WH—suffered as a result of Ms. Cameron's actions. Consequently, the district court did not err in increasing Ms. Cameron's offense level to reflect this abuse of trust.

## C.

■ Ms. Cameron argues that the district court abused its discretion in denying her a downward departure for her family responsibilities. Generally, we do not have jurisdiction to review a district court's refusal to grant a downward departure from the guideline range. *See United States v. Shaffer*, 993 F.2d 625, 628–29 (7th Cir. 1993). There are exceptions to this general rule, for example where the district court refuses to depart on the erroneous belief that it lacked the authority to do so. *See United States v. Canoy*, 38 F.3d 893, 903 (7th Cir.1994). In short, "[w]e may reverse a district court's decision to refuse a departure when it makes a mistake of law. However, if the district court had a correct legal understanding of the guideline yet still chose not to depart, we lack jurisdiction to review its decision." *United States v. Jaderany*, 221 F.3d 989, 994 (7th Cir.2000) (internal citations omitted).

*United States v. Dean*, 908 F.2d 215 (7th Cir.1990), is illustrative. In that case, the defendant argued that the district court should have granted a larger downward departure than it did. We stated that, "where the defendant fails to suggest any

law that the district court violated in departing downward, his appeal will be denied. Dean has made no such suggestion. Accordingly, we lack jurisdiction to review his challenge to his sentence." *Id.* at 218; *see also United States v. Coe,* 220 F.3d 573, 581 (7th Cir.2000) (stating that the defendant made "no argument that the district court's imposition of a sentence within the guidelines range ... was either in violation of law or was an incorrect application of the Guidelines" and thus we had no appellate jurisdiction to review the sentence); *United States v. Cruz–Velasco,* 224 F.3d 654, 663 (7th Cir.2000) (holding that there was no appellate jurisdiction where the defendant "challenges the dis-

trict court's factual findings and its discretionary decision not to depart").

In order to obtain appellate review, Ms. Cameron was required to show that the district court's refusal to depart was "in violation of the law." *United States v. Beltran,* 109 F.3d 365, 371 (7th Cir.1997). She does not argue, however, that the district court misapprehended its ability to depart; instead she argues that the facts presented to the district court warranted a downward departure. This type of argument is insufficient to invoke our appellate jurisdiction. *See Cruz–Velasco,* 224 F.3d at 663–64. Ms. Cameron failed to "suggest any law that the district court violated"; her failure precludes our review. *Dean,* 908 F.2d at 218.[8]

---

8. Even if we were to consider Ms. Cameron's failure to make the requisite argument a forfeiture, we do not believe that the district court's failure to depart in these circumstances constituted plain error. To succeed on plain error review, a defendant must show that an error occurred that affected the defendant's substantial rights. *See United States v. Woods,* 301 F.3d 556, 560 (7th Cir.2002). An error affects substantial rights if "it affected the outcome of the district court proceedings." *See United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). We consider that possibility below.

Under the case law of this and other circuits, it is very difficult to obtain a departure for family responsibility. We have stated that only "family circumstances so unusual that they may be characterized as extraordinary ... empower a district court to depart downward from an applicable sentencing guidelines range." *United States v. Guy,* 174 F.3d 859, 860 (7th Cir.1999). More is needed to prove extraordinary circumstances than " 'unrebutted testimony that the learning problems of [the defendant's] child will be aggravated by her absence' "; in order to justify a departure, the record must establish not only "that the harm 'would be greater than the harm to a normal child' but also that care from other sources would be unable to alleviate that harm." *United States v. Wright,* 218 F.3d 812, 815 (7th Cir.2000) (quoting *United States v. Stefonek,* 179 F.3d 1030, 1038 (7th Cir.1999)).

Furthermore, there are numerous cases in which this and other circuits have reversed a downward departure based on family responsibilities for a mentally ill person where there was no evidence that the defendant was essential to the family member's mental health or where there was no evidence concerning the effect that alternative caretakers would have on the disabled individual. *See United States v. McClatchey,* 316 F.3d 1122, 1130–33 (10th Cir.2003) (reversing a district court's downward departure that was based in part on the fact that the defendant cared for his 22–year–old son who had "severe psychological disabilities" and stating that "[t]he fact that a defendant cares for a family member with a mental or physical disability is not by itself sufficient to make the circumstances 'exceptional' "); *United States v. Madrigal,* 331 F.3d 258, 260 (2d Cir.2003) (reversing a downward departure based on family responsibility where the defendant had three children (teenage or older) who were having educational, behavioral or psychological problems and noting that, although the district court had apparently concluded that the defendant "would be better able to care for the children than any of the other available caretakers, ... *the court did not conclude that Ortiz was the only person capable of providing adequate care* for the youngest children" (emphasis added)). In a similar vein, in *Stefonek,* 179 F.3d at 1038, a psychiatrist and a psychotherapist "gave unrebutted testimony that the learning prob-

## Conclusion

For the foregoing reasons we affirm the judgment of the district court.

AFFIRMED

lems of [the defendant's] child [would] be aggravated by [the defendant's] absence." *Id.* Yet we found that such evidence alone was insufficient to justify a downward departure. We noted that the expert testimony did not "explore what care will be available for the child while Stefonek is in prison," or discuss alternative caregivers. *Id.* We noted that perhaps "professionals are available to deal with children's learning problems as effectively—probably more effectively—than the defendant." *Id.*

Ms. Cameron's evidence, although showing a very tragic life for her niece, does not show that her niece's condition will worsen, that she will suffer any detrimental effect should she be placed in the care of the state during Ms. Cameron's incarceration or that there are no alternative caregivers available. In the absence of such evidence, we could not have upheld a district court's downward departure based upon family circumstances.