In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2925

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LESLIE ANDERSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:04-cr-30111-WDS-3—**William D. Stiehl,** *Judge.*

ARGUED MAY 5, 2009—DECIDED SEPTEMBER 3, 2009

Before RIPPLE and SYKES, *Circuit Judges*, and LAWRENCE, *District Judge.**

RIPPLE, *Circuit Judge.* As a result of his involvement with a fraudulent telemarketing scheme, Leslie Anderson was charged with wire fraud, mail fraud and conspiring to commit an offense against the United States. After a five-

* The Honorable William T. Lawrence, District Judge for the Southern District of Indiana, is sitting by designation.

day trial, Mr. Anderson moved for a judgment of acquittal. The district court denied the motion, and the jury convicted Mr. Anderson on each of the twenty-four counts charged. At his sentencing hearing, Mr. Anderson raised a number of objections to the sentencing enhancements recommended by the Government, but the district court, with two exceptions, applied the recommended enhancements. As a result, the court determined Mr. Anderson's adjusted offense level to be 42 and his criminal history category to be I. The court departed from the recommended sentencing range, imposing a below-guidelines sentence of 280 months' imprisonment. Mr. Anderson now appeals. He claims that the evidence presented at trial was insufficient to support the jury's verdict; he also raises a number of challenges to his sentence. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

On May 17, 2005, Mr. Anderson was charged with several offenses arising out of his involvement with 1492828 Ontario, Inc., a Canadian telemarketing company doing business as First Capital Consumers Group ("First Capital"). Specifically, Mr. Anderson was charged with one count of conspiracy, in violation of 18 U.S.C. § 371, five counts of mail fraud, in violation of 18 U.S.C. § 1341, and eighteen counts of wire fraud, in violation of 18

U.S.C. § 1343. At Mr. Anderson's jury trial, the Government presented the following evidence.

### 1. The Creation of First Capital

Mr. Anderson, a Canadian citizen, became acquainted with David Dalglish through Mr. Anderson's Toronto-based home improvement business. Dalglish helped Mr. Anderson secure a lucrative contract with the city of Toronto, and Mr. Anderson, in return, loaned Dalglish a large sum of money so that Dalglish could open up a telemarketing business with his friend, Lloyd Prudenza. That business ultimately became known as First Capital.

By way of background, Dalglish had worked with Prudenza in the past. Specifically, Prudenza ran Consumer Credit Services ("CCS"), a telemarketing business that sold a "credit repair program" to individuals with poor credit histories. R.196 at 82-83. After a CCS telemarketer sold the product to a customer, a "verifier" from Vertech, an affiliate of CCS, would contact the customer, confirm the details of the purchase and obtain the customer's authorization to debit the customer's bank account. *Id.* at 83-85; R.199 at 145.

Dalglish hired Mark Lennox, a former Vertech employee, to work for First Capital. Dalglish informed Mr. Anderson of the hire and explained that Lennox was the "top verifier" at Vertech. R.199 at 145. He also informed Mr. Anderson that he needed additional funds for First Capital. In response, Mr. Anderson contributed an addi-

tional $20,000 to the company, this time in the form of an equity investment.

In 2001, Lennox, Dalglish and Mr. Anderson met to discuss First Capital's business model. Lennox explained to Dalglish and Mr. Anderson that First Capital would hold itself out as a "credit recovery business" that sold "benefits packages" to consumers. These benefits packages included coupons, brochures, a credit-repair guide and a "stored-value card." The stored-value card bore a MasterCard logo, but it was not a credit card because it had no independent purchasing power. Instead, before making a purchase, a user first was required to credit funds to the stored-value card. The user's purchasing power was limited to the amount of funds he had credited to the card in advance of the purchase. Lennox explained that the stored-value cards were the most important part of First Capital's benefits packages because they allowed First Capital's salespersons to tell its customers that they would receive a MasterCard with their benefits packages. The customers would then assume that they would be receiving credit cards that permitted them to make purchases that could be paid for later, either by a single payment or by a payment plan.

According to Lennox, stored-value cards were a relatively new concept in 2001. Therefore, Lennox claimed, "if you said to somebody that it was a bank card and it was a MasterCard, 100 percent would assume that you were talking about a credit vehicle, [and] that this thing had a credit limit to it. And we knew that, so this was a . . . huge advantage." R.196 at 93. Lennox also testified that

he had informed Mr. Anderson that a stored-value MasterCard would be included in the benefits packages. Lennox knew that Mr. Anderson would be responsible for approving his salary and other compensation, and he hoped that, by using the MasterCard as a "selling point," he could procure a large signing bonus. *Id.* at 92-95.

After that first meeting, Mr. Anderson wrote a letter to the Mill Haven Penal Institution, where Prudenza was serving a sentence for conspiracy to commit fraud, in order to facilitate Prudenza's early release on parole. Prudenza testified that, as part of his application for parole, he was required to "establish a game plan for [his] release." R.198 at 29. Mr. Anderson "provided [him] with a letter of employment to fit that game plan." *Id.* Shortly after Prudenza's release, he, Dalglish and Mr. Anderson met at Mr. Anderson's office. Prudenza brought his fiancee, Lesley McCloud, to the meeting, but she left after Mr. Anderson complained about her presence. Later, Mr. Anderson explained to Prudenza that "he didn't want women around when we're talking about things that . . . are illegal. . . . Because they would turn around and would rat on the situation." *Id.* at 32-33.

Prudenza testified that, at the meeting, he and Mr. Anderson discussed his incarceration and his criminal offense; he claimed that Mr. Anderson "knew . . . what [he had] been in jail for," and explained that his telemarketing experience and criminal conviction were an "enticement to bringing [him] aboard." R.199 at 49, 50. Prudenza further testified that everyone at the meeting, including Mr. Anderson, understood that they did not

have, and could not obtain, authorization to sell any type of MasterCard. He noted that, at the meeting, Mr. Anderson reviewed a sample "sales script"[1] and described the script as a "good gaff"[2] and a "good con." R.198 at 35, 39. In addition, Prudenza claimed that he discussed the possibility of police intervention with Mr. Anderson, telling him that they had to do things "in a certain way to avoid being caught right away." *Id.* at 37-38.

Later, after First Capital had begun preliminary operations, Lennox, Dalglish, Prudenza and Mr. Anderson met to discuss the sales scripts for telemarketers and verifiers. Lennox testified that he went over the scripts while Mr. Anderson was present. He testified that the scripts were intended to deceive First Capital's customers by convincing them that they would receive a credit card from a major bank in exchange for a fee.

## 2. First Capital's Business Operations

First Capital hired hundreds of telemarketing sales representatives who placed telephone calls from Toronto

---

[1] These "sales scripts" were written sales pitches that telemarketers used when soliciting or verifying a sale. The scripts reviewed at the meeting were substantially similar to those later used by First Capital.

[2] Prudenza explained that a "gaff" is a scam, con or rip-off.

to United States residents with poor credit histories.[3] The representatives, using First Capital's sales scripts, would suggest that First Capital could help its customers obtain credit cards in exchange for a fee. When a customer accepted First Capital's offer, a verifier would make a second call to the customer in order to obtain the customer's bank account information and the customer's permission to make an electronic funds transfer from the customer's bank account. The second call was recorded.

After receiving the customer's authorization and account information, the verifier would cause funds to be transferred out of the customer's bank account through an automated clearing house ("ACH"). First Capital used three ACHs during the course of its operation—ACH Direct, United Capturedyne Technologies ("UCT") and Check Recovery Systems ("CRS"). Mr. Anderson helped Dalglish and Prudenza establish a business relationship with ACH Direct. R.197 at 21-22; R.200 at 64-65. The relationship between First Capital and ACH Direct was short-lived, however, because ACH Direct received a large number of complaints from dissatisfied First Capital customers. From November 2001 through the summer of 2002, First Capital processed its electronic transfers through UCT. Like ACH Direct, UCT received a number of complaints and ceased providing

---

[3] First Capital obtained the contact information for these individuals by purchasing "leads lists" from list brokers in the United States.

services for First Capital. After First Capital's relationship with UCT ended, First Capital's managers and assistant managers—including Mr. Anderson, Dalglish, Prudenza and Lennox—met to discuss their problems with ACH Direct and UCT and to attempt to find a new processor.[4] First Capital then turned to CRS for ACH processing; that company also received numerous complaints from customers who had received no product, who had not received the product they were promised or who could not contact First Capital. R.197 at 40-42. These complaints were summarized in call logs that were later sent to First Capital.

At the height of its operations, First Capital had 250 employees. Lennox estimated that First Capital placed at least 10,000 telemarketing calls each week, resulting in about 500 successful sales per week. Over the course of its operation, First Capital defrauded approximately 40,000 victims out of more than $8 million.

### 3. Mr. Anderson's Role in First Capital

The Government presented evidence that Mr. Anderson held a position of authority in First Capital. Specifically, it introduced evidence of a September 2001 meeting at Toronto Dominion Bank, where Mr. Anderson introduced Dalglish to Gary Shaswell, the bank manager. Together, they set up a business account for First Capital.

---

[4] At that same meeting, Lennox distributed new sales scripts and leads lists.

During that meeting, Dalglish submitted a copy of First Capital's articles of incorporation; Mr. Anderson's name was listed on the articles as a director of the company. Dalglish also told Shaswell that Mr. Anderson was the president of the company. Although Mr. Anderson later claimed to have been surprised by Dalglish's statement and denied agreeing to serve as First Capital's president, he did not object to or correct any of Dalglish's representations to Shaswell. During the meeting, Mr. Anderson signed a number of documents which named him as a principal of the corporation, president of First Capital and a signatory on First Capital's account. R.199 at 152-55; R.200 at 34-41.

The Government also presented evidence that, in addition to being listed as president and principal, Mr. Anderson was considered a partner in First Capital; Mr. Anderson, Dalglish and Prudenza agreed that, after Mr. Anderson's initial loan to the company was repaid, they would divide First Capital's remaining profits between themselves. Prudenza testified that, during one meeting, he, Dalglish and Mr. Anderson each received a $400,000 share of First Capital's $1.2 million profit.[5]

Prudenza testified that Mr. Anderson's role in First Capital was primarily financial, as opposed to managerial. Mr. Anderson provided the startup funds for First Capital

---

[5] Prudenza indicated that, by this point, Mr. Anderson's initial loan to First Capital had been repaid. R.198 at 59. An earlier check, dated January 18, 2002, represented a partial repayment of that loan.

and handled First Capital's finances. He signed invoices and authorized payments for leads lists and benefits packages. R.197 at 35-39. In addition, several documents recording wire transfers made on First Capital's behalf bore Mr. Anderson's signature, although Mr. Anderson did not recall signing the documents. R.199 at 157.

Mr. Anderson's contributions to First Capital were not solely financial, however. For example, Mr. Anderson regularly met with Prudenza to discuss First Capital's operations, and he attended at least two managers' meetings where First Capital's sales pitch, verification problems and sales issues were discussed. Mr. Anderson also admitted that he had performed work on First Capital's offices, leased vehicles to First Capital and provided cell phones to Dalglish, Prudenza and two others. R.199 at 166; R.200 at 4-5. Furthermore, in August or September 2002, Mr. Anderson was left in charge of First Capital and oversaw all of the company's operations while Prudenza and Dalglish were vacationing in Italy. During that time period, Mr. Anderson signed payroll checks and authorized wire transactions for leads-list purchases.

The Government also introduced evidence pertaining to whether Mr. Anderson knew of the illegal nature of First Capital's activities. For example, Prudenza testified that Mr. Anderson took an active interest in First Capital's sales and "knew overall of what was going on" at First Capital. R.198 at 49-51, 54. According to Prudenza, Mr. Anderson knew that First Capital was misleading its customers: Prudenza testified that, after

the sales scripts were discussed during his first meeting with Mr. Anderson, Mr. Anderson asked, "Are Americans that stupid?" R.198 at 37. Prudenza also stated that he had informed Mr. Anderson of the complaints from the ACH companies and that he specifically had informed Mr. Anderson that First Capital had received complaints from customers who either had not received their credit repair packages or had not received what they had been promised. In addition, Stephen Simpson, one of Mr. Anderson's employees, testified that Mr. Anderson showed him a $400,000 check dated September 20, 2002. According to Simpson, Mr. Anderson "kissed [the check], put it in his pocket and he said, 'Thank God for stupid Americans.'" R.199 at 87.

**B.**

At the conclusion of the trial, Mr. Anderson filed a motion for a judgment of acquittal. The district court denied the motion. The jury found Mr. Anderson guilty on each of the counts charged against him.

At Mr. Anderson's sentencing hearing, the district court determined that Mr. Anderson's base offense level was 7 and his criminal history category was I. The court then applied the following sentencing enhancements: A twenty-level enhancement because the total loss resulting from the fraud was $8,273,893.50;[6] a six-level increase because the fraud involved more than 250

---

[6] R.183 at 31; *see* U.S.S.G. § 2B1.1(b)(1)(K).

victims; a two-level enhancement because the fraud targeted vulnerable victims; a two-level enhancement because a substantial part of the offense was committed outside the United States; a three-level enhancement based on Mr. Anderson's status as a manager or supervisor of the scheme;[7] and a two-level enhancement for obstruction of justice.[8] As a result, Mr. Anderson's adjusted offense level was 42, and the Guidelines recommended a sentencing range of 360 months to life imprisonment. The court imposed a below-guidelines sentence of 280 months' imprisonment.

## II

## DISCUSSION

Mr. Anderson appeals both his conviction and his sentence. He first contends that the Government failed to present sufficient evidence to prove that he possessed the knowledge or intent necessary to be guilty of the charged crimes. He also challenges the sentence imposed by the district court, arguing that the court improperly applied various sentencing enhancements and contending that the sentence imposed by the district court was unreasonable. We address each of these arguments in turn.

---

[7] U.S.S.G. § 3B1.1(b).

[8] U.S.S.G. § 3C1.1.

**A.**

Mr. Anderson first challenges the sufficiency of the evidence presented at trial, claiming that the Government failed to prove certain essential elements of the charged crimes. Mr. Anderson notes that, to support his conviction for mail and wire fraud, the Government was required to demonstrate that he knowingly participated in a fraudulent scheme with the specific intent to deceive or cheat the scheme's victims. *See United States v. Radziszewski*, 474 F.3d 480, 484-85 (7th Cir. 2007). Similarly, he points out that, to support his conspiracy conviction, the Government was required to prove that he knew of the essential nature and scope of the charged conspiracy and that he intended to participate in it. *See United States v. Bruun*, 809 F.2d 397, 410 (7th Cir. 1987).[9]

Mr. Anderson contends that the evidence presented at trial failed to establish that he possessed either the knowledge or the intent necessary to be guilty of the charged crimes. In support of this contention, he attacks the credibility of Lennox and Prudenza and claims that their testimony was not sufficiently specific to support a finding that he knowingly and intentionally participated in the fraudulent scheme. Mr. Anderson also claims that

---

[9] *See also United States v. Campbell*, 985 F.2d 341, 344-45 (7th Cir. 1993) (noting that, to prove that a defendant was a member of the conspiracy, "the Government must offer sufficient evidence to demonstrate that the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose" (citation omitted)).

his own testimony demonstrates that he lacked any criminal intent. At trial, Mr. Anderson claimed that he never read or discussed the sales scripts, that he was unaware that First Capital would offer stored-value cards, and that, by virtue of his passive role in First Capital, he was unaware of the fraudulent nature of First Capital's activities. He characterizes himself as a mere pawn in Dalglish and Prudenza's scheme, and he asserts that, had he known that First Capital was an illegal scam, he would have had nothing to do with it.

When reviewing a challenge to the sufficiency of the evidence, "we will only reverse a defendant's conviction if, viewing all evidence in the light most favorable to the government, no rational trier of fact could have found the defendant guilty of the charges beyond a reasonable doubt." *Radziszewski*, 474 F.3d at 484 (citation omitted). In raising such a challenge, Mr. Anderson faces a heavy burden; we shall not reverse his conviction unless there is no evidence from which a jury could have found him guilty of the charged offenses. *See United States v. Silva*, 781 F.2d 106, 108 (7th Cir. 1986).

In an attempt to satisfy this burden, Mr. Anderson contends that the jury should have disregarded the testimony of Lennox and Prudenza and instead should have credited his own version of the facts. This contention cannot succeed. "We repeatedly have refused to question the credibility of witnesses" when reviewing sufficiency-of-the-evidence challenges. *United States v. Roberts*, 534 F.3d 560, 569 (7th Cir. 2008). It is the province of the jury to assess the credibility of witnesses, and

we shall reverse such credibility determinations "only under exceptional circumstances, such as where it was physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *Radziszewski*, 474 F.3d at 485 (citations and quotation marks omitted). Mr. Anderson has pointed to no exceptional circumstances here, and the jury was therefore entitled to credit the testimony of Lennox and Prudenza.

We believe that the evidence presented at trial was sufficient to support the jury's verdict. The Government presented evidence that supports the conclusion that Mr. Anderson knew that First Capital was engaged in fraudulent activity. For example, Prudenza testified that he met with Mr. Anderson on a weekly basis to discuss First Capital's operations. He further testified that Mr. Anderson knew that First Capital was misleading its customers. Also, according to Prudenza, Mr. Anderson expressly acknowledged the illegal and fraudulent nature of the scheme.[10] The Government also presented circumstantial evidence that Mr. Anderson knowingly and intentionally joined the fraudulent activity. According to

---

[10] *See* R.198 at 32 (noting that Mr. Anderson "didn't want women around when we're talking about doing things that . . . are illegal"); *Id.* at 35 (describing the sales script as a "good con"); *see also id.* at 37 (testifying that, after discussing the sales scripts, Mr. Anderson asked "Are Americans that stupid?"); R.199 at 87 (testimony of Stephen Simpson) (stating that Mr. Anderson displayed a $400,000 check, kissed it and said "Thank God for stupid Americans").

the testimony elicited at trial, Mr. Anderson was present at several meetings where leads lists, sales scripts and customer complaints were discussed. In addition, Mr. Anderson was the named president of First Capital, held authority over First Capital's finances, and authorized payments for leads lists and benefits packages. Mr. Anderson also established First Capital's business checking account, worked on First Capital's offices, leased vehicles to the company, and provided cell phones to its managers. Furthermore, Mr. Anderson managed First Capital while Prudenza and Dalglish were absent, and he received at least $400,000 from the conspiracy's proceeds.

Contrary to Mr. Anderson's assertions, this evidence demonstrates that Mr. Anderson was more than a mere associate of Dalglish, Prudenza and the other participants in the scheme. Rather than simply being present at a few meetings where illegal activities were discussed, *cf. United States v. Baker*, 499 F.2d 845, 847 (7th Cir. 1974),[11]

---

[11] In *United States v. Baker*, 499 F.2d 845, 849 (7th Cir. 1974), we concluded that defendant Vela's act of driving two individuals to the site of a drug sale and his presence during two conversations where the purchase of drugs was discussed could not support his conspiracy conviction. Significantly, we noted that, although Vela was present during the two conversations, he "engaged only in 'small talk' and did not participate in the conversation on drug dealing." *Id.* at 847. Thus, the facts of that case differ from the facts presented here; as we have already indicated, the testimony presented at trial demonstrates that Mr. Anderson actively participated in the meetings

(continued...)

Mr. Anderson took an active role in First Capital, took steps to advance its activities and received a one-third share of its profits. A reasonable jury could have concluded, based on this evidence, that Mr. Anderson acted with knowledge of First Capital's fraudulent activity and with the specific intent to defraud First Capital's victims. *See Radziszewski*, 474 F.3d at 485 (noting that documentary evidence showed that funds from the fraudulent scheme were deposited into an account controlled by the defendant and concluding that this and other evidence demonstrated that the defendant was a knowing participant in the scheme).[12] We therefore conclude that evidence presented at trial adequately supports Mr. Anderson's conviction.

---

[11] (...continued)

and conversations where First Capital's operations were discussed.

[12] *See also United States v. Silva*, 781 F.2d 106, 109 (7th Cir. 1986) (holding that the defendant's false report that his vehicle had been stolen, his false representation that he had driven the vehicle on a certain date, and the fact that he insured the vehicle for $23,000, even though he owed only $6,000, were sufficient to demonstrate that the defendant intended to further the conspiracy); *United States v. Garcia*, 562 F.2d 411, 414 (7th Cir. 1977) (concluding that a jury could infer that the defendant participated in the conspiracy where the defendant was found in possession of proceeds from a drug transaction after he put a drug purchaser in contact with his brother, who dealt drugs).

**B.**

We now turn to Mr. Anderson's challenges to the sentence imposed by the district court. Mr. Anderson challenges the district court's application of a two-level sentencing enhancement for obstruction of justice and a three-level enhancement based on his role in the conspiracy. He further contends that the sentence imposed by the district court was unreasonable.

### 1. The Obstruction-Of-Justice Enhancement

Mr. Anderson asserts that he should not have received a sentencing enhancement under U.S.S.G. § 3C1.1, which provides for a two-level enhancement when a defendant obstructs or attempts to obstruct the investigation, prosecution, or sentencing of the charged crime. *Id.* He maintains that his testimony at trial amounted to no more than a simple denial of guilt, which, he claims, cannot support the application of the obstruction-of-justice enhancement.

We review the factual findings underlying the district court's application of the obstruction enhancement for clear error, and we review de novo whether those findings adequately support the enhancement. *United States v. House*, 551 F.3d 694, 697 (7th Cir. 2008). As we previously have noted, a district court may impose an obstruction-of-justice enhancement based on its conclusion that a defendant committed perjury at trial. *United States v. Williams*, 553 F.3d 1073, 1081 (7th Cir.),

*cert. denied*, 129 S. Ct. 2452 (2009).[13] Thus, if a district court finds that a defendant "gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory," the application of an obstruction enhancement is warranted. *United States v. Hach*, 162 F.3d 937, 949 (7th Cir. 1998) (citations and quotation marks omitted).

Before applying the obstruction-of-justice enhancement, the district court gave considerable thought to Mr. Anderson's objection to the enhancement and conducted a review of its trial notes. The court then concluded that although, at first, Mr. Anderson was not apprised fully of the nature of First Capital's activities, he nevertheless learned a great deal about First Capital, assisted the company and agreed to serve as its president. R.183 at 14. The court further concluded that Mr. Anderson "did know what [the] business was and became a part of it," and it specifically "[found] that [Mr. Anderson] did in fact testify falsely at trial." *Id.* at 15.

Given these judicial findings, we cannot accept Mr. Anderson's challenge to this enhancement. The court did not predicate its application of the enhancement on Mr. Anderson's mere denial of guilt. Instead, after comparing Mr. Anderson's testimony with the evidence presented by the Government, the district court

---

[13] *See* U.S.S.G. § 3C1.1 cmt. n.4 ("Note 4") (listing "committing, suborning, or attempting to suborn perjury" as an "example[] of the type[] of conduct to which [the obstruction] adjustment applies").

determined that Mr. Anderson testified falsely at trial. It therefore concluded that Mr. Anderson willfully obstructed justice by falsely denying any knowledge of the criminal nature of the enterprise. *See*, *e.g., United States v. Godinez*, 110 F.3d 448, 457 (7th Cir. 1997) (concluding that the defendant's "denial of any knowledge that there was a cocaine transaction going on" was "not the same as a general denial of guilt" and rejecting the defendant's sentencing challenge). Given the evidence against Mr. Anderson, we cannot say that this conclusion was clearly erroneous. The district court properly identified the false testimony supporting the enhancement and made an independent finding of perjury; having done so, it was permitted to impose the enhancement. *See United States v. Banks-Giombetti*, 245 F.3d 949, 954 (7th Cir. 2001) (concluding that the district court did not err in applying an obstruction-of-justice enhancement when it "credited the testimony of the [witnesses] over [the defendant's] and found by a preponderance of the evidence that [the defendant's] testimony was both false and material"); *United States v. Ofcky*, 237 F.3d 904, 910 (7th Cir. 2001) (holding that the district court "met all the standards required for the [obstruction-of-justice] enhancement" when it weighed the conflicting testimony and concluded that the defendant committed perjury).

### 2. The Manager-Or-Supervisor Enhancement

Mr. Anderson also challenges the district court's application of a sentencing enhancement pursuant to

U.S.S.G. § 3B1.1(b), which authorizes a three-level en-
hancement when a defendant acted as a manager or
supervisor of a criminal activity. We review the district
court's finding that Mr. Anderson exercised a managerial
or supervisory role in the offense for clear error. *United
States v. Sainz-Preciado*, 566 F.3d 708, 714 (7th Cir. 2009).

To qualify for an enhancement under section 3B1.1, a
defendant "must have been the organizer, leader, manager,
or supervisor of one or more other participants" in the
charged criminal activity.[14] U.S.S.G. § 3B1.1 cmt. n.2. The
Guidelines do not define the terms "manager" and
"supervisor." The commentary to section 3B1.1, however,
does set forth several factors that this court may use to
ascertain whether an individual had a supervisory role
in an offense. *United States v. Howell*, 527 F.3d 646, 649
(7th Cir. 2008).[15] Those factors include:

> (1) the exercise of decision-making authority; (2) the
> nature of participation in the commission of the of-
> fense; (3) the recruitment of accomplices; (4) the
> claimed right to a larger share of the fruits of the crime;

---

[14] For the purposes of that section, a " 'participant' is a person
who is criminally responsible for the commission of the offense,"
although the person need not have been convicted. U.S.S.G.
§ 3B1.1 cmt. n.1.

[15] Although the factors enumerated in the commentary were
designed to assist courts in distinguishing leaders from man-
agers, we also have "found that they are . . . relevant in ascer-
taining whether an individual had a supervisory role at all."
*United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008) (citation
omitted).

(5) the degree of participation in planning and organizing the offense; (6) the nature and scope of the illegal activity; (7) the degree of control and authority exercised over others.

*Id.* (citing U.S.S.G. § 3B1.1 cmt. n.4). "No one of these factors is considered a prerequisite to the enhancement, and, at the same time, the factors are not necessarily entitled to equal weight." *United States v. Wasz*, 450 F.3d 720, 729 (7th Cir. 2006). Although not all of these factors must be present, the enhancement cannot be applied unless the defendant "'exercised some control over others involved in the commission of the offense.'" *United States v. Gracia*, 272 F.3d 866, 877 (7th Cir. 2001) (quoting *United States v. Pagan*, 196 F.3d 884, 892 (7th Cir. 1999)).

Mr. Anderson claims that the Government presented no evidence that he exercised any influence or control over Prudenza, Dalglish or any other participants in the conspiracy. We disagree. There are many facts—several of which fit into one or more of the categories enumerated in Note 4—that support the district court's finding that Mr. Anderson managed or supervised one or more participants in the conspiracy. First, there is evidence that Mr. Anderson exercised decision-making authority over participants in the scheme: Lennox testified that Mr. Anderson approved his salary and signing bonus, R.196 at 93-95,[16] and Prudenza stated that Mr. Anderson

_____

[16] This testimony supports the district court's conclusion in two ways: First, it demonstrates that Mr. Anderson had the authority to decide how much compensation Lennox, a non-

(continued...)

[16] (...continued)

partner participant in the conspiracy, would receive for his role in the scheme. Second, it suggests that Mr. Anderson was Lennox's boss, rather than his equal, thus supporting the court's conclusion that Mr. Anderson supervised at least one participant. *See United States v. Polichemi*, 219 F.3d 698, 712 (7th Cir. 2000) ("Although the court did not find this fact explicitly, its discussion of Neal's relationship to Edward Russey and Larry Oesterman indicates that it found the necessary supervision. Neal was president of Konex Marketing, and Russey and Oesterman were salesmen for the company. As such, Neal was their boss, not their equal.").

Although Lennox was initially listed in the criminal complaint, *see* R.1 at 1, it appears that he was granted immunity in exchange for his cooperation. *See* R.196 at 23; R.197 at 61-67; R.200 at 119. Nevertheless, the fact that Lennox was not ultimately prosecuted or convicted does not preclude the finding that he was a "participant" in the offense for the purposes of U.S.S.G. § 3B1.1. As the commentary to that provision notes, "[a] 'participant' is a person who is criminally responsible for the commission of the offense, *but need not have been convicted*." U.S.S.G. § 3B1.1 cmt. n.1 (emphasis added). Moreover, we have previously accepted the argument that an individual who testified under a grant of immunity may be considered a "participant" in an offense. *See United States v. Jackson*, 95 F.3d 500, 511 (7th Cir. 1996). In *Jackson*, we affirmed the district court's denial of a reduction under U.S.S.G. § 3B1.2 (mitigating role in the offense), which defines "participant" in accordance with the commentary to U.S.S.G. § 3B1.1. *See* U.S.S.G. § 3B1.2 cmt. n.1. In that case, the Government argued that several telemarketers other than the indicted defendants should be considered criminally responsible "participants" in the

(continued...)

oversaw the whole of First Capital's operations while he and Dalglish were in Italy.[17] Second, the nature of Mr. Anderson's participation in the offense supports the district court's conclusion; because Mr. Anderson controlled the purse strings of First Capital, he likely had either direct or indirect financial control over other participants in the enterprise. Third, Mr. Anderson claimed a one-third share of First Capital's profits. The evidence of Mr. Anderson's decision-making authority over Lennox, his control of the enterprise during Prudenza and Dalglish's absence, his control of First Capital's finances and his receipt of a large share of First Capital's profits supports the district court's conclusion that Mr. Anderson was a manager or supervisor of the crim-

---

[16] (...continued)

scheme. *Jackson*, 95 F.3d at 511. Specifically, the Government noted that "two of the . . . employees who testified were granted immunity," and that "the apparent nature of the fraud from the script itself . . . strongly suggest[ed] that other telemarketers could have been indicted and prosecuted" had the Government sought to do so. *Id.* The defendant did not reply to that argument, which we found "convincing." *Id.*

[17] We have considered control over an enterprise, even on a temporary basis, to be a fact supporting the application of an enhancement under U.S.S.G. § 3B1.1. *See United States v. Sheikh*, 367 F.3d 683, 688 (7th Cir. 2004) (noting that the defendant "exclusively ran the store and directed Yousef's activities for a period of time during which the fraud continued").

inal enterprise.[18] We therefore conclude that the district court did not clearly err in applying the manager-or-supervisor enhancement.

### 3.  The Reasonableness Of Mr. Anderson's Sentence

In his third and final challenge to his sentence, Mr. Anderson claims that the sentence imposed by the district court is unreasonable. We review the substantive reasonableness of a sentence under the abuse-of-discretion standard. *United States v. Omole*, 523 F.3d 691, 698 (7th Cir. 2008). Where, as here, the district court imposes a below-guidelines sentence, it is presumed that the sentence is not unreasonably high. *United States v. Wallace*, 531 F.3d 504, 507 (7th Cir. 2008) ("A sentence within the [guidelines] range is presumptively reason-

---

[18] *See Sheikh*, 367 F.3d at 688 (concluding that the court did not clearly err by deeming the defendant a supervisor when the defendant "made countless deposits of illegally obtained food stamps, obtained a large portion of the proceeds from the fraud as compared to other participants . . . exclusively ran the store and directed Yousef's activities for a period of time during which the fraud continued, and terminated the services of the bookkeeping firm when it pointed out accounting irregularities"); *United States v. Gracia*, 272 F.3d 866, 877 (7th Cir. 2001) (concluding that the district court did not err in applying a section 3B1.1 enhancement where the defendant, among other things, "provided or directed large sums of money far greater than the $50 or $75 paid to the minor participants and received a correspondingly far larger share").

able, and it follows that a sentence below the range also is presumptively not too high." (citations omitted)).

Mr. Anderson contends that his sentence was unreasonable for two reasons: First, he asserts that the district court failed to consider his advanced age, his medical history, his limited culpability and his good character when determining his sentence. Second, he asserts that there is an unjustifiable disparity between his sentence and the sentences of his coconspirators.

The first of these arguments is unsupported by the record. Before imposing Mr. Anderson's sentence, the district court considered a number of factors, including Mr. Anderson's age, physical condition and education level, Congress' determination that telemarketing fraud warrants "a stiff penalty due to the nature of the crime and the numbers of people affected," the scope of the conspiracy, the vulnerability of its victims, and the actions taken by the coconspirators to avoid detection. R.183 at 53-56. It specifically indicated, moreover, that it was departing from the recommended sentencing range based on its assessment of Mr. Anderson's age, his physical condition and, most significantly, its conclusion that Mr. Anderson "was to a certain extent duped by the conspiracy." *Id.* at 56. Thus, the court adequately explained the sentence it imposed, and it sufficiently addressed Mr. Anderson's claim that, in light of his age, medical condition and relative culpability, a below-guidelines sentence was warranted. *Cf. United States v. Kincannon*, 567 F.3d 893, 901 (7th Cir. 2009) (deeming the imposition of a thirty-year sentence "presump-

tively reasonable" where the district court considered the defendant's claim for leniency in light of his advanced age, but declined to impose a below-guidelines sentence in light of other countervailing factors).

Mr. Anderson's second challenge to the reasonableness of his sentence also must fail. Mr. Anderson claims that his sentence should be vacated in light of the disparity between his sentence and the sentences of his codefendants, which, he submits, is unjustified. We previously have concluded, however, that an asserted discrepancy between the sentences of two codefendants is an insufficient basis for challenging a sentence. *Omole*, 523 F.3d at 700 ("This court refuses to view the discrepancy between sentences of codefendants as a basis for challenging a sentence."). We shall not disturb a sentence based on a claim of an unjustifiable disparity between the sentences of codefendants unless the defendant can show that the sentence imposed "creates a disparity between the length of [his] sentence and all other similar sentences imposed *nationwide*." *Id.* (citation and quotation marks omitted).

Mr. Anderson has failed to demonstrate that there is an unwarranted disparity between his sentence and the sentences of defendants with similar records who have been convicted of similar crimes. *See United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). Mr. Anderson has not pointed to any cases where a similarly situated defendant received a sentence that was significantly lower than his own. In his brief, Mr. Anderson points to a number of cases that, he claims, involved defendants

convicted of similar crimes who received sentences disproportionately shorter than his own. *See* Appellant's Br. 43-45. However, the disparity in sentencing reflects legitimate factual differences between Mr. Anderson's case and those on which he relies. Of the cases cited by Mr. Anderson, only three involve telemarketing fraud. Of those three telemarketing fraud cases, two involve defendants who were sentenced under a guidelines provision that is no longer in force.[19] Furthermore, it is not clear that any of the telemarketing cases cited by Mr. Anderson involved more than 250 victims, nor does it appear that any of those cases involved crimes in which a substantial part of the offense was committed outside

---

[19] Two of the telemarketing fraud cases cited by Mr. Anderson involve defendants who were sentenced under an earlier guidelines provision pertaining to offenses involving fraudulent conduct. *See* U.S.S.G. § 2F1.1, *deleted by consolidation with* U.S.S.G. § 2B1.1 (effective Nov. 1, 2001). Under that section, the applicable base offense level for individuals convicted of fraud was set at 6; where the loss from the fraudulent conduct exceeded $5,000,000 but was less than $10,000,000, the base offense level was enhanced by only 14. *See* U.S.S.G. §§ 2F1.1(a), (b)(1)(O) (2000). Mr. Anderson, however, was sentenced under U.S.S.G. § 2B1.1; under the terms of that provision, his base offense level was set at 7, and he received a 20-level enhancement because the loss caused by the fraud exceeded $7,000,000. U.S.S.G. §§ 2B1.1(a)(1), (b)(1)(K). Thus, any difference between Mr. Anderson's sentence and the sentences of those individuals sentenced under section 2F1.1 may be explained by the difference in the base offense levels and enhancements set forth in the applicable guidelines provisions.

of the United States. Those facts were, however, established in this case, and they had a significant impact on Mr. Anderson's sentencing range; Mr. Anderson received a six-level increase in his offense level because of the number of victims of the offense, *see* U.S.S.G. § 2B1.1(b)(2)(C), and a two-level increase because a substantial part of the scheme was committed outside the United States, *see* U.S.S.G. § 2B1.1(b)(9)(B).

The factual distinctions between the cases cited by Mr. Anderson and his case, together with the difference in the guidelines provisions and enhancements applicable in those cases, make the cases cited by Mr. Anderson a poor basis for comparison. The difference between Mr. Anderson's sentence and the sentences of the defendants in those cases may have been caused by any one of a number of facts that distinguish Mr. Anderson's case from the others. Thus, we cannot conclude that there is any *unwarranted* disparity between Mr. Anderson's sentence and the sentences of similarly situated defendants nationwide.[20]

---

[20] Furthermore, to the extent that Mr. Anderson's sentence differs from his codefendants' sentences, that difference may be explained by his codefendants' willingness to plead guilty, their cooperation with the Government, and the imposition of a two-level obstruction-of-justice enhancement in Mr. Anderson's case. *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (concluding that the difference between the codefendants' sentences did not amount to an unwarranted disparity, because it was "justified by legitimate considerations, such as rewards for cooperation").

Accordingly, we must conclude that Mr. Anderson has failed to establish any unjustified disparity between his sentence and the sentences of similarly-situated defendants. Because Mr. Anderson has not presented any evidence or arguments sufficient to overcome the presumption that his below-guidelines sentence is reasonable, we shall not disturb his sentence on appeal.

### Conclusion

For the reasons set forth in this opinion, we affirm the decision of the district court.

AFFIRMED